IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
MIDLAND-ODESSA DIVISION

| | | |
|---|---|---|
| PERMIAN BASIN PETROLEUM ASSOCIATION | § | |
| CHAVES COUNTY, NEW MEXICO | § | |
| ROOSEVELT COUNTY, NEW MEXICO | § | |
| EDDY COUNTY, NEW MEXICO, and | § | |
| LEA COUNTY, NEW MEXICO, | § | |
| | § | |
| Plaintiffs | § | |
| | § | |
| v. | § | Civil Action No. 7:14-cv-50 |
| | § | |
| DEPARTMENT OF THE INTERIOR, | § | |
| U.S. FISH AND WILDLIFE SERVICE, | § | |
| SALLY JEWELL, and DANIEL M. ASHE, | § | |
| | § | |
| Defendants | § | |

---

**COMPLAINT**

---

## I. INTRODUCTION

1.      Plaintiffs the Permian Basin Petroleum Association and Chaves County, Roosevelt County, Eddy County and Lea County, New Mexico, bring this action against the Department of the Interior ("Interior"), the United States Fish and Wildlife Service ("FWS" or "the Service"), as well as certain employees of Interior and the Service in their official capacities, seeking relief for their violations of the Administrative Procedure Act ("APA") in issuing a decision to list the Lesser Prairie-Chicken (or "LPC") as a threatened species pursuant to the Endangered Species Act (or "ESA"). *See* FWS, Endangered and Threatened Wildlife and

Plants; Determination of Threatened Status for the Lesser Prairie-Chicken, 79 Fed. Reg. 19,973-20,071 (Apr. 10, 2014) (hereinafter the "Listing Decision").

2.    At the urging of the Service, Plaintiffs and many other private and public stakeholders, including five States, have designed and undertaken conservation efforts on a massive scale to improve LPC habitat and otherwise diminish threats to the LPC in order to avoid having the species listed. In issuing their decision to list the Lesser Prairie-Chicken as threatened, Defendants violated their own policy, which prescribes in detail how they must carefully evaluate such conservation efforts to determine whether a listing is unnecessary because those efforts will be implemented and effective. In so doing, Defendants also mischaracterized their policy such that they could never fairly consider the future benefits of conservation efforts that have yet to be fully implemented or to demonstrate their effectiveness, as the policy was intended to do.

3.    Despite the Service's own data and analysis showing that the Lesser Prairie-Chicken population has increased over the last decade and its occupied range has nearly tripled in the last 30 years, the Service based its Listing Decision in large measure on its conclusions that the LPC is suffering from a reduced population and diminished habitat. These unjustified conclusions, coupled with the Service's failure to fairly consider the expected future benefits of conservation efforts covering millions of acres and costing tens of millions of dollars, led the Defendants to their irrational conclusion that the LPC population will decline, that its range will contract in the future, and that the Lesser Prairie-Chicken is therefore likely to become in danger of extinction in the foreseeable future.

4.    The Defendants' Listing Decision has injured and will continue to injure the Plaintiffs.  Because of the listing, Plaintiffs are likely to incur expenses to avoid actions that are

prohibited by the ESA, suffer impairment of their operations and business opportunities, experience diminishment of their interests in lands and minerals, expend resources to secure permits required by the ESA and suffer business delays in seeking those permits, lose revenue from operations, and be denied the benefits of their voluntary efforts to implement measures which, in conjunction with the efforts of many others, should have been sufficient to avoid the listing.

5.      Defendants are not authorized to cause such injuries through agency actions that are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law or without observance of procedure required by law.  Because Defendants have done so, Plaintiffs ask this Court to hold unlawful and set aside the Listing Decision.

## II. PARTIES

6.      Plaintiff PERMIAN BASIN PETROLEUM ASSOCIATION ("PBPA"), with offices in Midland and Austin, Texas, represents over 1,000 member companies engaged in all aspects of environmentally responsible exploration and production of oil and natural gas in the Permian Basin region of West Texas and southeastern New Mexico.  The Permian Basin is the most prolific oil-producing region in the United States and produces approximately 20 percent of the oil produced annually in America.  PBPA's mission is to provide safety education, legislative and regulatory engagement, and support services for the petroleum industry to promote members' effectiveness.

7.      On behalf of its members, PBPA filed comments with the Service throughout the regulatory process regarding the listing of the Lesser Prairie-Chicken under the ESA.  Members of PBPA also filed comments both in conjunction with, and separate from, PBPA.  PBPA

members actively participate in and allocate resources to conservation efforts and measures for the Lesser Prairie-Chicken.

8.      PBPA member companies have existing leases, current oil and natural gas production, and plans for future leasing, exploration, and production activities in areas with Lesser Prairie-Chicken habitat, and therefore have been, are being, and will continue to be impacted by the Listing Decision. Because of the listing of the Lesser Prairie-Chicken as threatened, PBPA member companies may, among other harms, be subject to: (1) additional permitting requirements under the ESA for their existing, proposed and future projects; (2) precluded from conducting certain activities; or (3) penalized for inadvertently violating the ESA.  On federal leases, PBPA's members will likely be subject to heightened requirements and additional mitigation measures for their operations.   Delays in permitting and additional mitigation requirements due to the listing could affect the ability of PBPA's members to meet their lease commitments to federal, state, and fee lessors.  The listing could preclude operations by PBPA's members in certain areas to protect the Lesser Prairie-Chicken and its habitat and could subject them to potential liability for any actions they take that might affect the Lesser Prairie-Chicken.

9.      Plaintiff CHAVES COUNTY is a county in New Mexico.  Chaves County has allocated significant resources to the conservation of the LPC, including working with the Bureau of Land Management in a land exchange specifically designed to allow the Bureau of Land Management to actively manage populations of the Lesser Prairie-Chicken, and reviewing its land use plan and long range planning process to foster, promote and protect the Lesser Prairie-Chicken.  The Service has identified that approximately half of Chaves County contains historic range of the Lesser Prairie-Chicken and approximately 15 to 20 percent of Chaves

County contains currently occupied range of Lesser Prairie-Chicken. The listing of the Lesser Prairie-Chicken creates a wide range of adverse effects upon the Chaves County community, industries, and people who are located within, reside, ranch, farm, and use the public and private lands in Chaves County. Activities that could "take" the Lesser Prairie-Chicken may need to be curtailed, including those related to oil and gas development and agriculture/farming. Chaves County has significant levels of oil and gas development. Chaves County relies upon both the revenues and jobs produced by oil and gas development. Chaves County also ranks high among counties in New Mexico in agricultural production. Chaves County relies heavily upon the jobs provided by the agricultural community in Chaves County. Losses in the energy and agriculture sectors will adversely affect Chaves County's economic health and vitality.

10.     Plaintiff ROOSEVELT COUNTY is a county in New Mexico. Roosevelt County is entirely within the historic range of the Lesser Prairie-Chicken, and approximately 40 percent of Roosevelt County contains current occupied range of Lesser Prairie-Chicken. The listing of the Lesser Prairie-Chicken creates a wide range of adverse effects upon the Roosevelt County community, industries and people who are located within, reside, ranch, farm and use the public and private lands in Roosevelt County. Activities that could "take" the Lesser Prairie-Chicken may need to be curtailed, including those related to oil and gas development and agriculture/farming. These are the primary economic activities within Roosevelt County. Roosevelt County has significant oil and gas production and is one of the most important counties in New Mexico in terms of agricultural production. Losses in the energy and agriculture sectors will adversely affect the economy of Roosevelt County, and lead to a decline in jobs.

11.     Plaintiff EDDY COUNTY is a county in New Mexico. The Service has identified that approximately one-third of Eddy County contains historic range of the Lesser Prairie-

Chicken and approximately 5 percent of Eddy County contains currently occupied range of Lesser Prairie-Chicken.  The listing of the Lesser Prairie-Chicken creates a wide range of adverse effects upon the Eddy County community, industries and people who are located within, reside, ranch, farm and use the public and private lands in Eddy County.  Activities that could "take" the Lesser Prairie-Chicken may need to be curtailed, including those related to oil and gas development and agriculture/farming.  Eddy County is one of the top oil producing counties in New Mexico. Eddy County also is a farming and ranching county where agricultural production contributes millions of dollars to the economy. Listing will create losses in the energy and agriculture sectors that will adversely affect Eddy County's economic health and vitality.

12.    Plaintiff LEA COUNTY is a county in New Mexico entirely within the estimated historic range of the Lesser Prairie-Chicken.  Approximately 20 percent of Lea County contains current occupied range of Lesser Prairie-Chicken.  The listing of the Lesser Prairie-Chicken creates a wide range of adverse effects upon the Lea County community, industries and people who are located within, reside, ranch, farm and use the public and private lands in Lea County.  Activities that could "take" the Lesser Prairie-Chicken may need to be curtailed, including those related to oil and gas development and agriculture/farming, which are the primary economic activities within Lea County.  Lea County has significant levels of oil and gas development.  Lea County relies upon both the revenues and jobs produced by oil and gas development. Lea County's economy also has a significant agricultural sector.  Losses in the energy and agriculture sectors will adversely affect Lea County's economic health and vitality.

13.    Plaintiffs Chaves, Roosevelt, Eddy and Lea Counties (collectively "Plaintiff Counties"), and their communities, industries and residents, have participated in the listing process for the Lesser Prairie-Chicken, including by submitting comments to and attending

meetings and hearings with the Service.  Plaintiff Counties, and their communities, industries and residents, have allocated significant resources to and actively participated in conservation efforts for the Lesser Prairie-Chicken.

14.     The economic and legal interests of Plaintiff PBPA, including their members, and Plaintiff Counties, including their residents (hereinafter collectively "Plaintiffs"), have been, are being, and, unless the relief sought is granted, will continue to be adversely affected by Defendants' unlawful listing of the Lesser Prairie-Chicken as threatened under the ESA. Defendants' actions have caused actual, concrete injuries to Plaintiffs, and the relief sought would redress these injuries.  Plaintiffs have no adequate remedy at law.

15.     Defendant DEPARTMENT OF THE INTERIOR ("Interior") is the federal agency charged with administration of the ESA.

16.     Defendant UNITED STATES FISH AND WILDLIFE SERVICE is an agency or instrumentality of the United States within the federal Department of the Interior.  The Secretary of the Interior has delegated responsibility for implementing the ESA and its regulations regarding the listing of terrestrial species, including the Lesser Prairie-Chicken, to the Service. When used herein, "FWS" or "Service" refers to the Defendants collectively unless otherwise specified.

17.     Defendant SALLY JEWELL is the Secretary of the Interior, and is sued in her official capacity. Secretary Jewell, in her capacity as Secretary of the Interior, has ultimate responsibility for Interior and FWS's actions under the ESA.

18.     Defendant DANIEL M. ASHE is the Director of FWS and is sued in his official capacity.  Director Ashe oversees FWS, the agency charged with implementing much of the ESA.

### III.  JURISDICTION AND VENUE

19.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. §1331 (federal question), the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq*., and the Endangered Species Act, 16 U.S.C. §§ 1531 *et seq*.  This Court can grant declaratory and injunctive relief under 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 701-706.

20.     An actual, justiciable controversy now exists between Plaintiffs and Defendants, and the requested relief is therefore proper under 28 U.S.C. §§ 2201-2202 and 5 U.S.C. § 701-706.

21.     Venue properly lies in this judicial district under 28 U.S.C. § 1391 because: (1) PBPA resides in and does business in this judicial district, as do members of PBPA; (2) the Lesser Prairie-Chicken and its historic and occupied range at issue in and affected by the Listing Decision are located in this judicial district; and (3) a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district, including actions of FWS Southwest Regional Office (Region 2), which covers the Service's operations in Texas, including in the Western District of Texas judicial district.

22.     The Federal government has waived sovereign immunity in this action pursuant to the APA, 5 U.S.C. § 702.

### IV.  LEGAL FRAMEWORK

**A.  Administrative Procedure Act**

23.     The APA provides for judicial review of final agency action by persons "adversely affected" or "aggrieved" by such action.  5 U.S.C. § 702.

24.     The actions reviewable under the APA include "preliminary, procedural, or intermediate agency action or ruling . . . on the review of the final agency action."  *Id*. § 704.

25.    The APA also provides standards applicable when a federal agency proposes and adopts final rules and regulations.  *Id*. §§ 553, 551(4).

26.    Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

27.    A reviewing court shall also "hold unlawful and set aside agency action, findings and conclusions found to be . . . without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

**B.  Endangered Species Act**

28.    The purposes of the Endangered Species Act are "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, to provide a program for the conservation of such endangered and threatened species, and to take such steps as may be appropriate to achieve the purposes of the treaties and conventions set forth in subsection (a) of this section."  16 U.S.C. § 1531(b).

*(1) Endangered Species Act Listing Decisions*

29.    Under Section 4(a) of the ESA, the Secretary of the Interior determines by regulation whether any species of fish, wildlife, or plants are "threatened" or "endangered" based upon five enumerated factors.  *Id.* § 1533(a)(1).

30.    The ESA defines a species as endangered when it is "in danger of extinction throughout all or a significant portion of its range."  *Id.* § 1532(6).  The ESA defines a species as threatened if it is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."  *Id.* § 1532(20).

31.     To list a species the Secretary must find that one or more of the following factors are present:

> (A) the present or threatened destruction, modification, or curtailment of its habitat or range;
>
> (B) overutilization for commercial, recreational, scientific, or educational purposes;
>
> (C) disease or predation;
>
> (D) the inadequacy of existing regulatory mechanisms; or
>
> (E) other natural or manmade factors affecting its continued existence.

*Id.* § 1533(a)(l).

32.     For each listing determination, the Endangered Species Act directs the Service to publish in the Federal Register a summary of the data that form the basis for the regulation.  The Service must demonstrate the relationship of such data to the adopted regulation.  *See id*. § 1533(b)(8).

33.     In 2003, after notice and comment rulemaking, the Service issued its Policy for Evaluation of Conservation Efforts ("PECE Policy").  *See* FWS, Policy for Evaluation of Conservation Efforts When Making Listing Decisions, 68 Fed. Reg. 15,100 (Mar. 28, 2003).

34.     While the ESA requires the Service, in making its listing decision, to take into account all conservation efforts being made to protect a species, the PECE Policy "identifies criteria [the Service] will use in determining whether formalized conservation efforts that have yet to be implemented or to show effectiveness contribute to making listing a species as threatened or endangered unnecessary."  68 Fed. Reg. at 15,100.  The PECE Policy applies to conservation efforts identified in conservation agreements, conservation plans, and other similar documents.  *Id.*

35.     The Service acknowledges that the PECE Policy establishes a consistent set of criteria to evaluate conservation efforts and that the PECE Policy provides notice to states and other entities, such as local governments, that are developing agreements or plans related to conservation, of the criteria that the Service will use in evaluating conservation efforts when making listing decisions.  *Id*. at 15,101.

36.     The Service acknowledges, thus, that the PECE Policy will guide states and other entities as they develop conservation efforts to make listing unnecessary.  *Id.*

37.     The Service applies the PECE Policy to all formalized conservation efforts not yet implemented regardless of whether "formal conservation efforts [were] developed with or without a specific intent to influence a listing decision and with or without the involvement of the Services."  FWS, Announcement of Draft Policy for Evaluation of Conservation Efforts When Making Listing Decisions, 65 Fed. Reg. 37,102, 37,103 (proposed June 13, 2000).

38.     Pursuant to the PECE Policy, the Service evaluates conservation agreements to determine: (1) the certainty that the conservation efforts will be implemented and (2) the certainty that the efforts will be effective.  68 Fed. Reg. at 15,101.

39.     To determine the "certainty that the conservation effort will be implemented," the Service must evaluate the nine criteria set forth in the PECE Policy as follows:

> 1. The conservation effort, the party(ies) to the agreement or plan that will implement the effort, and the staffing, funding level, funding source, and other resources necessary to implement the effort are identified.
>
> 2. The legal authority of the party(ies) to the agreement or plan to implement the formalized conservation effort, and the commitment to proceed with the conservation effort are described.
>
> 3. The legal procedural requirements (e.g. environmental review) necessary to implement the effort are described, and information is provided indicating that fulfillment of these requirements does not preclude commitment to the effort.

4. Authorizations (e.g., permits, landowner permission) necessary to implement the conservation effort are identified, and a high level of certainty is provided that the party(ies) to the agreement or plan that will implement the effort will obtain these authorizations.

5. The type and level of voluntary participation (e.g., number of landowners allowing entry to their land, or number of participants agreeing to change timber management practices and acreage involved) necessary to implement the conservation effort is identified, and a high level of certainty is provided that the party(ies) to the agreement or plan that will implement the conservation effort will obtain that level of voluntary participation (e.g., an explanation of how incentives to be provided will result in the necessary level of voluntary participation).

6. Regulatory mechanisms (e.g., laws, regulations, ordinances) necessary to implement the conservation effort are in place.

7. A high level of certainty is provided that the party(ies) to the agreement or plan that will implement the conservation effort will obtain the necessary funding.

8. An implementation schedule (including incremental completion dates) for the conservation effort is provided.

9. The conservation agreement or plan that includes the conservation effort is approved by all parties to the agreement or plan.

68 Fed. Reg. at 15,114-15.

40.    The Service has indicated that a "high level of certainty of funding does not mean that funding must be in place now for implementation of the entire plan, but rather, it means that we must have convincing information that funding will be provided each year to implement relevant conservation efforts."  The Service also stated:  "[w]e believe that at least 1 year of funding should be assured, and we should have documentation that demonstrates a commitment to obtain future funding."  *Id*. at 15,108.

41.    To determine the "certainty that the conservation effort will be effective," the Service must evaluate six criteria set forth in the PECE Policy as follows:

1. The nature and extent of threats being addressed by the conservation effort are described, and how the conservation effort reduces the threats is described.

2. Explicit incremental objectives for the conservation effort and dates for achieving them are stated.

3. The steps necessary to implement the conservation effort are identified in detail.

4. Quantifiable, scientifically valid parameters that will demonstrate achievement of objectives, and standards for these parameters by which progress will be measured, are identified.

5. Provisions for monitoring and reporting progress on implementation (based on compliance with the implementation schedule) and effectiveness (based on evaluation of quantifiable parameters) of the conservation effort are provided.

6. Principles of adaptive management are incorporated.

68 Fed. Reg. at 15,115.

### (2) *Candidate Species Conservation Agreements*

42.    Candidate species are those plants and animals that are candidates for listing under the Endangered Species Act.  Proactive conservation efforts for these species can eliminate the need to list them under the ESA.

43.    Because non-Federal lands support much of the habitat and populations of declining species, the Service considers collaboration with the private owners and users of these lands essential for the success of conservation efforts.  *See* FWS Notice, Announcement of Draft Policy for Candidate Conservation Agreements, 62 Fed. Reg. 32,183, 32,184 (June 12, 1997).

44.    Using its authority under ESA Section 10(a)(1)(A) to authorize activities intended to enhance survival of an affected species, the Service has developed and supports use of a variety of measures to encourage private landowners to protect declining species voluntarily, including authorization of Candidate Conservation Agreements ("CCA") and Candidate Conservation Agreements with Assurances ("CCAA").  *See* 16 U.S.C. § 1539(a)(1)(A); 50 C.F.R. §§ 17.22(d), 17.32(d).

45.     CCAs and CCAAs are formal, voluntary agreements between the Service and one or more parties to address the conservation needs of one or more candidate species or species likely to become candidates in the near future.  "These agreements are intended to reduce or remove identified threats to a species. Implementing conservation efforts before species are listed increases the likelihood that simpler, more cost-effective conservation options are available and that conservation efforts will succeed."  79 Fed. Reg. at 19,992.

46.     Under a CCA, Federal managers and other cooperators (nongovernmental organizations and lease holders) implement conservation measures that reduce threats on Federal lands and leases.  Under a CCAA, non-federal landowners and lease holders voluntarily provide habitat protection or enhancement measures on their lands, thereby reducing threats to the species.

47.     Prior to approving a CCAA, the Service must find that:

> (i) The take will be incidental to an otherwise lawful activity and will be in accordance with the terms of the [Agreement];
>
> (ii) The [Agreement] complies with the requirements of the Candidate Conservation Agreement with Assurances policy available from the Service;
>
> (iii) The probable direct and indirect effects of any authorized take will not appreciably reduce the likelihood of survival and recovery in the wild of any species;
>
> (iv) Implementation of the terms of the [Agreement] is consistent with applicable Federal, State, and Tribal laws and regulations;
>
> (v) Implementation of the terms of the [Agreement] will not be in conflict with any ongoing conservation programs for species covered by the permit; and
>
> (vi) The applicant has shown capability for and commitment to implementing all of the terms of the [Agreement].

50 C.F.R. § 17.32(d)(2).

48.     Private property owners who enter into a CCAA commit themselves to implement voluntary conservation measures for proposed or candidate species, or species likely to become candidates or proposed in the near future.  In return, the Service assures those private property owners that the Service will not require additional conservation measures and will not impose additional land, water, or resource use restrictions in the event of listing.  *See* Service Policy for Candidate Conservation Agreements with Assurances, 64 Fed. Reg. 32,706, 32,726 (June 17, 1999). CCAAs are intended to remove enough threats to the covered species to preclude any need to list them as threatened or endangered under the Act.  *Id*. at 32,707.

49.     If the Service lists the species during the term of the CCAA, the CCAA contains a draft incidental take permit (known as an enhancement survival permit) that becomes effective and governs "takes" by those participating in the CCAA.  *See* ESA Section 10(a)(1)(A), 16 U.S.C. § 1539(a)(1)(A); 50 C.F.R. § 17.32(d)(1).

50.     In lieu of a site-specific CCAA, the Service can authorize an ''umbrella'' or programmatic CCAA with states, Tribes, or local entities.  According to the Service's CCAA policy, such CCAAs specify the assurances and take allowances that could be granted to individual property owners who participate in the umbrella CCAA.  *See* 64 Fed. Reg. at 32,727.

51.     Region 2 of the Service describes the CCAA process as follows:

> The ultimate goal of CCAAs is to remove enough threats to the target species to eliminate the need for protection under the ESA. Before entering into a CCAA and providing regulatory assurances, the FWS must reasonably expect and make a written finding that the species included in the agreement will receive a sufficient conservation benefit from the activities conducted under the agreement. "Sufficient conservation benefit" means that the management actions to be taken would remove the need to list the covered species when combined with actions carried out on other necessary properties. "Other necessary properties" are those on

which conservation measures would have to be implemented in order to preclude or remove any need to list the covered species.[1]

### (3) Consequences of Listing a Species

52.     Once a species is listed, no persons may take any threatened or endangered members of that species without additional federal authorization.  *See* 16 U.S.C. § 1538(a).  The Endangered Species Act defines "take" to mean "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  *Id*. § 1532(19).  "Harm" is defined to include significant habitat modification or degradation if it results in the death or injury to a listed species by significantly impairing essential behavior patterns, including breeding, feeding, or sheltering.  50 C.F.R. § 17.3.

53.     The "take" prohibition can lead to prohibitions on farming, oil and gas drilling, renewable energy development, or other activities on private or federal lands that may modify existing habitat or "harass" the species in some way.  "Harass" means an "intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering."  50 C.F.R. § 17.3.

54.     Violations of the ESA take prohibitions carry both criminal and civil penalties.  The ESA provides criminal penalties of up to one year imprisonment and fines of up to $50,000, or both, for knowing violation of the take provision and the harm regulation.  *See* 16 U.S.C. § 1540(b).  The ESA provides civil penalties of up to $32,500 for each violation of the Act.  *See* 16 U.S.C. § 1540(a); 77 Fed. Reg. 72,915, 72,916 (Dec. 7, 2012).

---

[1]     FWS, National Factsheet, *Candidate Conservation Agreements with Assurances for Non-Federal Property Owners* (Feb. 2004), http://www.fws.gov/southwest/es/newmexico/documents/CCAA_national_factsheet.pdf.

55.    For projects with a federal nexus (e.g., those requiring a federal approval or funding), Section 7 of the Endangered Species Act requires any federal agency authorizing the project to consult with the Service prior to granting such authorization to ensure that the project will not jeopardize the continued existence of the listed species.  16 U.S.C. § 1536(a)(2).  In addition to potential prohibitions or imposition of project revisions or constraints developed by the Service during the mandatory consultation, the time necessary for completion of the Section 7 consultation process can delay projects substantially.

56.    Section 4(d) of the Endangered Species Act authorizes the Service to establish special regulations for the take of threatened species that the Service deems necessary and advisable to provide for the conservation of the species.  16 U.S.C. § 1533(d).

57.    Pursuant to this authority, the Service developed general prohibitions and exceptions to those prohibitions under the Endangered Species Act that apply to most threatened species.   50 C.F.R. §§ 17.31, 17.32.   The Service may provide further species-specific regulations for threatened species under Section 4(d).

### (4) Critical Habitat Designation

58.    The Endangered Species Act requires the Service to designate critical habitat at the time of listing to the maximum extent prudent and determinable for such listed species. 16 U.S.C. § 1533(a)(3).  If the Service fails to make the determination at the time of listing, it typically must make a determination within a year.  *Id.* § 1533(b)(6)(C).

59.    Once the Service designates critical habitat, no one may take any action authorized, funded, or carried out by a federal agency that will result in the destruction or adverse modification of that critical habitat prior to that agency consulting with the Service pursuant to Section 7 of the Endangered Species Act.  16 U.S.C. § 1536(a)(2).

## V.  PROCEDURAL AND FACTUAL BACKGROUND

**A.  The Lesser Prairie-Chicken**

*(1) Facts About the Species*

60.    The Lesser Prairie-Chicken (*Tympanuchus pallidicinctus*) is a species of prairie grouse native to the southern high plains of the United States.  It is related to other species of prairie grouse, including the greater prairie-chicken, Attwater's prairie-chicken, greater sage-grouse, Gunnison's sage-grouse, and sharp-tailed grouse.  79 Fed. Reg. at 19,998.

61.    The Lesser Prairie-Chicken is a ground-dweller, recognized by its stout build, feathered legs, brown and buff-colored barred plumage, and lek mating behavior.  Lesser prairie-chickens typically range in length from 15 to 16 inches.  Males have long feather tufts on the sides of their necks, bright yellow eyecombs, and dull reddish esophageal air sacs, all of which they use in their courtship displays.  *Id.*

62.    Male LPCs gather to engage in a communal, competitive courtship display in areas known as leks, where they use specialized plumage and vocalization to attract females for mating.  Leks are typically located in areas with low vegetation or bare soil and enhanced visibility of the surrounding area, such as exposed hilltops and sparsely vegetated dunes.  Leks are often surrounded by taller, denser vegetative cover used for nesting and foraging.  *Id.* at 19,999.

63.    Male LPCs gather at leks at dawn and at dusk from late January through May or June.  The sounds produced by the courting males attract nearby females, who arrive in early spring after the males begin displaying.  After successful mating, hens will usually nest within a mile or two of an active lek.  *Id.*

*(2) Habitat*

64.    The Lesser Prairie-Chicken's preferred habitat is native prairies consisting of short- and mixed-grasses with some shrubs.  The dominant shrub species are typically sand sagebrush (*Artemesia filifolia*) or shinnery oak (*Quercus havardii*).  *Id.* at 20,006.

65.    Lesser prairie-chickens are found in the grasslands of Kansas; the sand sagebrush native rangelands of Colorado, Kansas, Oklahoma, and Texas; and in the shinnery oak-bluestem grasslands of New Mexico, Oklahoma, and Texas.  *Id.*

66.    Over the years, estimates have been made of the Lesser Prairie-Chicken's historic and occupied range.  The Service has stated that the historic range prior to European settlement was estimated to have encompassed between 100,000 and 150,000 square miles.  *Id.* at 20,008.

67.    According to the Service, due to widespread conversion of native prairie to cultivated cropland, the estimate of the area occupied by the Lesser Prairie-Chicken decreased to 138,225 square miles by the 1880s and to roughly 48,263 square miles by 1969.  The Service believes that by 1980, the occupied range of the Lesser Prairie-Chicken was estimated to encompass 10,541 square miles.  *Id.*

68.    In 2007, experts from the Texas, New Mexico, Oklahoma, Kansas and Colorado state wildlife agencies engaged in cooperative mapping efforts and re-estimated the maximum historic and currently occupied ranges.  They estimated the maximum historic occupied range of the Lesser Prairie-Chicken to be 180,309 square miles and the current occupied range to be 25,101 square miles.  *Id.* at 20,009.

69.    Since 2007, adjustments to the estimated occupied range in Colorado and Kansas have resulted in a revised current occupied range estimate of 27,259 square miles.  *Id.*

70.    Approximately 95 percent of the current estimated occupied range of the Lesser Prairie-Chicken occurs on privately owned land.  *Id.*

71.    According to the Service, the current occupied range (27,259 square miles) represents roughly 16 percent of the revised historic range (180,309 square miles) prior to European settlement, or an 84 percent reduction.  *Id.*

72.    According to the Service's estimates, the current occupied range (27,259 square miles) represents nearly a tripling of occupied range since 1980 (10,541 square miles).  *See* FWS, Listing the Lesser Prairie-Chicken as a Threatened Species, 77 Fed. Reg. 73,827, 73,845 (proposed Dec. 11, 2012).

73.    The Lesser Prairie-Chicken's estimated occupied range includes parts of Andrews County, Texas, which is within the Midland-Odessa Division of the Western District of Texas judicial district.

74.    All of the Midland-Odessa Division is within the Lesser Prairie-Chicken's estimated historic range.

75.    The following map of the Lesser Prairie-Chicken's estimated occupied and historic range is available on the FWS Southwest Region 2 website.[2]

---

[2]    FWS Ecological Services Southwest Region, Lesser Prairie-Chicken Estimated Range Map (Feb. 18, 2011), http://www.fws.gov/southwest/es/images/LPC_Estimated_Range.jpg.



*(3) Population Size*

76.    Very little information is available regarding the Lesser Prairie-Chicken population size prior to 1900.

77.    Rangewide estimates for the Lesser Prairie-Chicken population are essentially nonexistent for years prior to 1960. 79 Fed. Reg. at 20,010.

78.    The Service states that, by the mid-1960s, the total rangewide population was estimated to be between 36,000 and 43,000 birds.  *Id.*

79.    According to the Service, Lesser Prairie-Chicken population estimates remained in the 32,000 to 52,900 range through 2012 when the states and the Western Association of Fish and Wildlife Agencies ("WAFWA") performed an aerial survey and estimated populations based on lek counts.  *Id.* at 20,010-11.

80.    The Lesser Prairie-Chicken population can fluctuate considerably from year to year, depending on weather and habitat conditions.  The Service concluded that as a result, short-term analyses can sometimes show statistically significant changes from one year to the next, even though the Lesser Prairie-Chicken population is actually stable when evaluated over a longer period of time.  *Id.* at 20,015.

81.    In 2013, after the December 2012 proposed listing, the states and WAFWA repeated the aerial survey and reanalyzed the 2012 aerial survey results.  This resulted in a 2012 estimated population of 34,440 Lesser Prairie-Chickens and a 2013 estimated population of 17,616 Lesser Prairie-Chickens.  *Id.* at 20,011.

82.    As stated in its Listing Decision, the Service believes the aerial surveys conducted in 2012 provide the best estimate of current population size for the Lesser Prairie-Chicken.  *Id.* at 20,010.

**B.  The Service's Pre-Listing Consideration of the Lesser Prairie-Chicken**

83.    In October 1995, the Service received a petition to list the Lesser Prairie-Chicken as threatened.

84.    In July 1997, the Service made a positive 90-day finding for the Lesser Prairie-Chicken and the Service initiated a status review for a 12-month finding.  *See* FWS Notice, 90-

Day Finding for a Petition to List the Lesser Prairie-Chicken as Threatened, 62 Fed. Reg. 36,482, 36,482 (July 8, 1997).

85.    In the 12-month finding, the Service determined that listing of the Lesser Prairie-Chicken under the ESA was "warranted but precluded" by other higher priority actions and classified the Lesser Prairie-Chicken as a candidate species.  FWS Notice, 12-Month Finding for a Petition to List the Lesser Prairie-Chicken as Threatened and Designate Critical Habitat, 63 Fed. Reg. 31,400, 31,400 (June 9, 1998).

86.    Between 1999 and 2008, the Service gave the Lesser Prairie-Chicken a priority of 8 out of 12 for listing, 1 being the highest.  *See* FWS, Notice of Review, 64 Fed. Reg. 57,534, 57,538 (Oct. 25, 1999); FWS, Notice of Review, 72 Fed. Reg. 69,034, 69,060 (Dec. 6, 2007).

87.    In 2001, the Service stated that, because states within the occupied range of the Lesser Prairie-Chicken were "committing significant resources via personnel, outreach, and habitat improvement incentives to landowners to recover the species," "[w]e believe that barring prolonged drought, the species' status is improving overall and should continue to improve in future years" due to state conservation measures.  FWS, Notice of Review, 66 Fed. Reg. 54,808, 54,817-18 (Oct. 30, 2001).

88.    In December 2008, the Service raised the priority of the Lesser Prairie-Chicken to 2 and kept it at that priority until 2011.  *See* FWS, Notice of Review, 73 Fed. Reg. 75,176, 75,179-80 (Dec. 10, 2008); FWS, Notice of Review, 76 Fed. Reg. 66,370, 66,393 (Oct. 26, 2011).

## C. Efforts to Conserve the Species and Its Habitat and Avoid Listing

### *(1) Encouragement of Voluntary Conservation Efforts by the Service*

89.     Prior to and during the listing process, the Service has repeatedly referred to the numerous conservation actions that have been implemented across the Lesser Prairie-Chicken's five-state range during the last 10 to 15 years to conserve and restore its habitat and improve the status of the species.  *See, e.g.*, 77 Fed. Reg. at 73,830.[3]  The Service also acknowledges that the "State conservation agencies have taken a lead role in implementation of these actions."  *Id.*

90.     In the context of the Lesser Prairie-Chicken, the Service acknowledges that continued implementation of State, local and private conservation efforts is "crucial to Lesser Prairie-Chicken conservation" and that "these efforts have helped reduce the severity of the threats to the species, particularly in localized areas." 77 Fed. Reg. at 73,836.  Indeed, the ESA "encourages cooperation with the States."  77 Fed. Reg. at 73,837.

91.     According to the Service, the "vast majority (approximately 95%) of LPC habitat occurs on privately owned and operated lands across the five-state range. Therefore, the voluntary actions of private landowners are the key to maintaining, enhancing, restoring and reconnecting habitat for the species."[4]

---

[3]     *See also* FWS, Q&A for the Lesser Prairie-Chicken (July 2012), http://www.fws.gov/southwest/es/Documents/R2ES/LPC_FAQ_18July2012.pdf;  FWS, Q&A: Proposed Rule to List Lesser Prairie-Chicken as Threatened (Nov. 30, 2012), http://www.fws.gov/southwest/es/Documents/R2ES/LPC_Proposed_Listing_FAQs_Final_30Nov2012.pdf;  FWS, Q&A: Final Listing Determination and Special Rule for the Lesser Prairie-Chicken, 1 (Mar. 2014), http://www.fws.gov/southwest/es/documents/R2ES/LPC_FL_FAQs_FINAL_20140327.pdf.

[4]     *See* FWS, Conference Opinion for the Natural Resources Conservation Service's Lesser Prairie-Chicken Initiative, 2 (Nov. 22, 2013), http://www.fws.gov/southwest/es/Documents/R2ES/LPC_NRCS_CO_FINAL_22Nov2013.pdf.

92.     Consequently, the Service encouraged landowners and others to enter into CCAs and CCAAs, which the Service explained provide incentives for "property owners to engage in voluntary conservation activities that can help make listing a species unnecessary."[5]

93.     Specifically, prior to listing the LPC, the Service encouraged State and private stakeholder cooperation to develop and seek approval for a five-state comprehensive range-wide CCAA to conserve the species.

94.     According to the Service, the "ultimate goal of CCAAs is to remove enough threats to the target species to eliminate the need for protection under the ESA."[6]

95.     To achieve this, the Service encouraged State representatives at public meetings to "continue to move forward with the authority of State Agency leadership to benefit the LPC" and "make it a workload priority."[7]

### (2) Overview of Conservation Efforts

96.     Conservation efforts for the Lesser Prairie-Chicken implemented prior to listing include, but are not limited to, the five-state WAFWA's Lesser Prairie-Chicken Range-Wide Conservation Plan; the U.S. Department of Agriculture ("USDA") Natural Resources Conservation Service ("NRCS") Lesser Prairie-Chicken Initiative ("LPCI"); the USDA Farm Services Agency Conservation Reserve Program ("CRP"); an umbrella CCA and CCAA with the Bureau of Land Management and New Mexico; one umbrella CCAA in Texas and one in

---

[5]      *See* FWS Fact Sheet, *Candidate Conservation Agreements* (March 2011), http://www.fws.gov/southwest/es/Documents/R2ES/CCA_Fact_Sheet.pdf

[6]      *See* FWS, National Factsheet, *Candidate Conservation Agreements with Assurances for Non-Federal Property Owners* (Feb. 2004), http://www.fws.gov/southwest/es/newmexico/documents/CCAA_national_factsheet.pdf.

[7]      *See* FWS Presentation, *Lesser Prairie-Chicken, Conservation Priority* (delivered at Texas Park and Wildlife, LPC public meeting, Aug. 11, 2012), http://www.fws.gov/southwest/es/Documents/R2ES/LPC_TPW_public_meeting_10Aug2012.pdf.

Oklahoma; and numerous other state and private conservation efforts and initiatives. *See* 77 Fed. Reg. at 73,830-36.[8]

97.     Upon information and belief, to date, the Service has not conducted an analysis of the cumulative effect of these conservation efforts or the likely cumulative benefits to be expected from implementation of these efforts in the foreseeable future.

98.     Numerous comments and correspondence submitted to the Service prior to the Listing Decision provided estimates of the acreage and commitments covered by these and other conservation efforts to benefit the Lesser Prairie-Chicken.

99.     PBPA and its members provided the Service several examples of conservation efforts that, as of March 2013, covered or were expected to cover several million acres of land, including the:

- **New Mexico** Oil and Gas CCA (583,782.63 acres), Ranch CCA (840,088 acres), Oil and Gas CCAA (512,700.72 acres), and Ranch CCAA (816,044 acres);

- **Texas** farming and ranching CCAA (approximately 315,000 acres);

- **Oklahoma** Department of Wildlife Conservation approved Agricultural CCAA (200,000 acres expected by September 30, 2013); and

- **NRCS** LPCI (benefitting more than 600,000 acres within high priority LPC habitats since 2010).

*See* PBPA et al., Comments on December 11, 2012 Proposed Listing, 3-4 (Mar. 11, 2013), FWS-R2-ES-2012-0071-0216.[9]  These early 2013 estimates did not include an assessment of overall acreage and commitments under the later-adopted Range-wide Conservation Plan.

---

[8]     For a detailed description of existing conservation programs that benefit the Lesser Prairie-Chicken, see WAFWA, The Lesser Prairie-Chicken Range-wide Conservation Plan, 38-66 (Oct. 2013), http://www.wafwa.org/documents/2013LPCRWPfinalfor4drule12092013.pdf.

### (3) Approval and Success of the Range-Wide Conservation Plan

100.    Starting in April 2012, the Lesser Prairie-Chicken Interstate Working Group of WAFWA began developing the Lesser Prairie-Chicken Range-wide Conservation Plan ("RWP").

101.    The RWP represents a dedicated and cooperative effort to conserve the Lesser Prairie-Chicken by the five States of Texas, New Mexico, Oklahoma, Kansas, and Colorado, the State fish and wildlife agencies, stakeholders, and property owners, with input and comment from the public and the Service.  The RWP was intended to preclude the need to list the LPC under the ESA.  *See* RWP at 1.  Pursuant to the RWP, agreements with participating landowners will improve habitat conditions for the Lesser Prairie-Chicken, increase populations and provide for long-term conservation of the species.  The RWP identifies focus areas in each state for Lesser Prairie-Chicken conservation efforts, includes a strategy to address threats to the LPC throughout its range, provides the framework to achieve these goals and objectives, demonstrates the administrative and financial mechanisms necessary for successful implementation, and includes monitoring and adaptive management provisions.

102.    On October 13, 2013, the Service endorsed the RWP, referring to the Plan as a "landmark, collaborative planning effort."  In so doing, the Director of the Service acknowledged that the "unprecedented collaborative efforts of WAFWA and the five state wildlife agencies have produced a sound conservation plan for the Lesser Prairie-Chicken," and stated "We applaud the states' commitment to lead conservation actions across the bird's range."[10]

---

[9]    Hereinafter, all citations with a document identification number reference the Service's regulatory docket FWS-R2-ES-2012-0071 available at www.regulations.gov.

[10]    *See* FWS Press Release, *U.S. Fish and Wildlife Service Endorses Western Association of Fish and Wildlife Agencies Lesser Prairie-Chicken Range-Wide Conservation Plan* (Oct. 23,

103. On December 13, 2013, WAFWA applied to the Service for a Section 10(a)(1)(A) Enhancement of Survival Permit and approval of the RWP CCAA (a/k/a the "Range-wide Oil and Gas Industry CCAA"). *See* 78 Fed. Reg. 76,639. On February 28, 2014, the Service approved and signed the RWP CCAA for the Lesser Prairie-Chicken and issued the Enhancement of Survival Permit.[11] The Service also released an accompanying environmental assessment, Finding of No Significant Impact, and a completed internal Endangered Species Act Section 7 consultation.

104. Pursuant to the CCAA, WAFWA and its participants will implement the conservation measures of the RWP to reduce and/or eliminate known threats to the Lesser Prairie-Chicken within the current "estimated occupied range plus a buffer of 10 miles" ("EOR+10") in Colorado, Kansas, New Mexico, Oklahoma, and Texas.

105. RWP CCAA participants have committed to implementing conservation measures that benefit the Lesser Prairie-Chicken by avoiding and minimizing disturbance, impacts and threats to Lesser Prairie-Chicken and its habitat.

106. The RWP CCAA conservation measures specify that oil and gas development should avoid high priority Lesser Prairie-Chicken areas, namely focal areas, connectivity zones, and within 1.25 miles of known leks that have been active in the past 5 years, and should instead focus on lands with existing impacts (e.g., developed oilfields) or cultivation (i.e., row-crops). The conservation measures also specify that impacts of oil and gas development should be minimized by reducing the area of surface disturbance through directional drilling and clustering

---

2013), http://www.fws.gov/news/ShowNews.cfm?ID=E6267BFC-E38A-E402-8295AE3A5FD77DF1.

[11] *See* Permit and related materials *available at* http://www.fws.gov/coloradoes/Lesser_prairie_chicken/.

of facilities as well as by use of common rights-of-way for infrastructure such as roads, pipelines, and power lines. The conservation measures address mortality and injury threats by providing guidance to reduce collision risks with new distribution lines, fences, and other structures in the vicinity of active leks. The conservation measures also provide measures to avoid and minimize disturbances to Lesser Prairie-Chicken during the lekking, nesting, and brooding seasons within 1.25 miles of active leks (i.e., occupied in the past 5 years).[12] Where impacts cannot be avoided or minimized, CCAA participants are responsible for paying mitigation fees to WAFWA that will provide for offsite mitigation practices designed to improve LPC habitat, especially in high priority areas.

107.    In approving the RWP CCAA, the Service acknowledged that "[t]he benefits provided by the combination of the conservation measures, mitigation framework, and adaptive management will result in focal areas and connectivity zones that will have reduced threats and disturbances to [Lesser Prairie-Chicken], and improved habitat that is concentrated in larger blocks of contiguous habitat. These conditions are expected to (1) result in an increase in [LPC] populations throughout the currently occupied range, (2) maintain and expand the current distribution of the [LPC] across its estimated occupied range, and (3) increase population numbers that will result in more sustainable long-term populations within each of the four delineated ecoregions." Conference Opinion for RWP CCAA Permit, 49.

108.    Prior to the Listing Decision, WAFWA kept the Service informed about commitments under the RWP on a consistent and regular basis.

---

[12]    *See* Intra-Service Section 7 Conference Opinion on the Proposed Issuance of a Section 10(a)(1)(A) Enhancement of Survival Permit for Lesser Prairie-Chicken to WAFWA, 7 (Feb. 28, 2014) (hereinafter "Conference Opinion for RWP CCAA Permit"), *available at* http://www.fws.gov/coloradoes/Lesser_prairie_chicken/LEPC_Oil%20and%20Gas%20Rangewide%20CCAA_Conference%20Opinion%20(signed%20and%20scanned).pdf.

109.    The Listing Decision does not include a discussion of the acreage or monetary commitments made by participants enrolled in the RWP and the RWP CCAA approved by the Service.

110.    As of March 5, 2014, and prior to the Listing Decision, WAFWA had announced that over 20 companies in five states had enrolled more than 2.5 million acres in the Lesser Prairie-Chicken RWP, representing oil and gas, pipelines, electric transmission, and wind energy and resulting in a nearly $15 million commitment for conservation over the next three years. These RWP commitments were in addition to the landowner CCAAs for farmers and ranchers in New Mexico, Texas, and Oklahoma covering a total of nearly 2.3 million acres across the three States.[13]  The Service received this information.

111.    As of March 25, 2014, prior to the Listing Decision, oil and gas, pipelines, electric transmission and wind energy companies had enrolled 3.6 million acres in the RWP CCAA, and provided approximately $21 million for habitat conservation over the next three years.[14]  The Service received this information.  According to WAFWA, these commitments were in addition to acreage committed under other conservation efforts, including:

- Conservation Reserve Program managed by the USDA Farm Service Agency – about 3.4 million acres;

---

[13]    WAFWA Press Release, *Lesser Prairie-Chicken Range-Wide Plan Reaches 2.5 Million Acres in Five States, Industry Enrollment Provides Nearly $15 Million for Habitat Conservation* (Mar. 5, 2014), http://www.wafwa.org/documents/LPCenrollmentnewsrelease3-5-14.pdf.

[14]    WAFWA Press Release, *Lesser Prairie-Chicken Range-Wide Plan Tops 3.6 Million Acres, Industry Enrollment Provides Nearly $21 Million for Habitat Conservation* (Mar. 25, 2014), http://www.wafwa.org/documents/LPCenrollmentnewsrelease4-25-14.pdf .

- Working Lands for Wildlife Program and Lesser Prairie-Chicken Initiative managed by the USDA Natural Resources Conservation Service – about 800,000 acres;

- New Mexico CCAs and CCAAs managed by the Center for Excellence – about 1.5 million acres of industry enrollment and 1.75 million acres of ranching enrollment; and

- Oklahoma and Texas farming/ranching CCAAs – about 820,000 acres.

112.    In the April 10, 2014 Listing Decision, the Service concludes that "[a]t the time of the listing decision, based upon the criteria in PECE, the Service is uncertain concerning availability of funding and the level of voluntary participation in the rangewide plan in the future."  79 Fed. Reg. at 19,980.

113.    Conversely, in the final special 4(d) rule for the RWP issued the same day as the Listing Decision, the Service indicates that "[t]o the extent that there ***may be uncertainty*** as to the effectiveness of the strategy, the [RWP] contains adaptive management provisions that allow flexibility in its implementation over time ***to ensure that the plan results in improvement*** of the status of the species towards the habitat and population goals therein."  FWS, Special Rule for the Lesser Prairie-Chicken, 79 Fed. Reg. 20,074, 20,081 (Apr. 10, 2014) (emphases added).

114.    In reviewing the RWP under the 4(d) rule criteria, the Service determined that the Plan "includes a strategy to address threats to the lesser prairie-chicken throughout its range, establishes measurable biological goals and objectives for population and habitat, provides the framework to achieve those goals and objectives, demonstrates the administrative and financial mechanisms necessary for successful implementation, and includes adequate monitoring and adaptive management provisions."  *Id.* at 20,076-77.

115.    The 4(d) rule concludes that the RWP is "a comprehensive conservation program that reflects a sound conservation design and strategy that, when implemented, will provide a net conservation benefit to the lesser prairie-chicken. Ultimately, the rangewide plan is one that, when implemented, will address the conservation needs of the lesser prairie-chicken."  79 Fed. Reg. at 20,077.

116.    In the Listing Decision, the Service did not address the fact that private companies had enrolled over 3.6 million acres in the RWP CCAA at the time of the Listing Decision and had funded its operations for three years.

117.    As of June 3, 2014, WAFWA reported that, under the RWP CCAA, 160 oil, gas, wind, electric, and pipeline companies have enrolled approximately 9 million acres and committed more than $43 million for habitat conservation over the next three years.[15]  According to WAFWA, in addition to these RWP CCAA commitments, as of June 2014, more than 3 million acres of private land has been enrolled in conservation agreements across the three states of Texas, New Mexico, and Oklahoma, including about 400,000 acres enrolled by the Oklahoma Department of Wildlife Conservation, nearly 675,000 acres by the Texas Parks and Wildlife Department, and nearly 2 million acres by the Center of Excellence in New Mexico. In addition, the Center of Excellence has enrolled another 1.9 million acres of oil and gas lease under separate conservation agreements in New Mexico.

118.    Participants in the RWP CCAA include PBPA members.

**D.  The Service's Proposal to List**

119.    On December 11, 2012, the Service issued its proposal to list the LPC as a threatened species.  77 Fed. Reg. 73,828.  According to the Service, the primary factors

---

[15]     WAFWA Press Release, *Unprecedented Effort Protects Prairie Chicken Habitat in Five States* (June 3, 2014), http://www.wafwa.org/documents/LPC-NewsRelease-6.3.2014.pdf.

supporting its proposal were the "historical, ongoing, and probable future impacts of cumulative habitat loss and fragmentation." *Id*.

120.   The Service provided a "Summary of Recent and Ongoing Conservation Actions." *Id*. at 73,830.  This summary included a description of the NRCS LPCI program, the CRP, the RWP, and the three State CCA/CCAAs.  *Id*. at 73,830-36.  The Service "recognize[d] the importance of the conservation efforts undertaken by all entities across the range of the lesser prairie-chicken." *Id*. at 73,836.  The Service acknowledged that some of these efforts had slowed alteration of LPC habitat, and emphasized that "continued implementation of these and similar future actions is critical to lesser prairie-chicken conservation." *Id*.  Nonetheless, the Service concluded:

> However, our review of conservation efforts indicates that the measures identified are not adequate to fully address the known threats, including the primary threat of habitat fragmentation, in a manner that effectively reduces or eliminates the threats . . . .  All of the efforts are limited in size or duration, and the measures typically are not implemented at a scale that would be necessary to effectively reduce the threats to this species across its known range.  Often the measures are voluntary, with little certainty that the measures will be implemented.  In some instances, mitigation for existing development within the range of the lesser prairie-chicken has been secured, but the effectiveness of the mitigation is unknown.  Conservation of this species will require persistent, targeted implementation of appropriate actions over the range of the species to sufficiently reduce or eliminate the primary threats to the lesser prairie-chicken.

*Id*.

121.   The Service found that the LPC "is likely to become in danger of extinction in the foreseeable future and therefore meets the definition of a threatened species." *Id*. at 73,883.  The Service relied upon its conclusions that the LPC is vulnerable to habitat loss and fragmentation, including "functional" fragmentation caused by vertical structures that the Service asserts the LPC seeks to avoid.  The Service stated that additional suitable habitat would be avoided by the LPC out to a radius of one mile surrounding a tall vertical object, such as a wind turbine.  *Id*.

The Service also listed many other aspects of modern human activity it believed are causing impacts to LPC:  petroleum production, roads, utility lines, fences, wells, and buildings. *Id*.  It concluded that "[t]hese threats are currently impacting lesser prairie-chickens throughout their range and are projected to increase in severity into the foreseeable future." *Id*.

122.    The Service explained that "[a] species that is in danger of extinction at some point ***beyond the foreseeable future*** does not meet the definition of either an endangered species or a threatened species." *Id*. at 73,884 (emphasis added).  The Service has not defined the "foreseeable future," but it said the "the foreseeable future refers to the extent to which the [Service] can reasonably rely on predictions about the future in making determinations about the future conservation status of the species." *Id*.

123.    The Service emphasized that the LPC has experienced "major range reductions (84 percent)" from the estimated range that existed prior to European settlement, but acknowledged that "there continues to be uncertainty around the current status of the species . . . ." *Id*.  The Service also explained that "it is unlikely that a single stochastic event (*e.g.*, drought, winter storm) will affect all known extant populations equally or simultaneously, therefore, it would require several stochastic events over a number of years to bring the lesser prairie-chicken to the brink of extinction due to those factors alone." *Id*.  The Service said that the "current and ongoing threats of conversion of grasslands to agricultural uses, encroachment by invasive woody plants, wind energy development, and petroleum production are not likely to impact all remaining populations significantly in the near term . . . ." *Id*.  Nonetheless, the Service concluded that the LPC "is subject to significant current and ongoing threats in the foreseeable future." *Id*.

### E. Comments Submitted to the Service

124.    During the course of five public-comment periods, the Service received a little over 57,000 written submissions.  79 Fed. Reg. at 19,976.  Of these, approximately 56,800 were form letters.  Public and private entities that had made deep commitments—financial, scientific, programmatic and on-the-ground implementation—toward LPC conservation efforts over a period of years provided more detailed and substantive submissions.

### (1) PBPA

125.    On March 11, 2013, PBPA and others submitted comments on the Service proposal.  PBPA commented that the Service had failed to conduct a PECE analysis of collaborative conservation measures and had improperly dismissed them.  Further, PBPA requested an extension of time to make the Listing Decision to "allow the Conservation Plan and the new 5-state oil and gas CCAAs to work, and to perform a PECE analysis."  PBPA et al., Comments on December 11, 2012 Proposed Listing, 20-21 (Mar. 11, 2013), FWS-R2-ES-2012-0071-0216.

126.    PBPA emphasized that the large and rapidly expanding amalgam of dozens of federal, state, and private conservation programs for the LPC provide effective collaboration on a scale never seen before in the conservation arena.  PBPA described these extensive efforts, as well as new ones recently adopted and under development, and urged the Service to give those efforts time to have their intended beneficial impacts so as to remove any perceived need for invoking ESA restrictions to protect the LPC.  In this regard, PBPA specifically pointed out that the Service had devoted seven pages of its proposal to describing the many dozens of LPC conservation measures and efforts only to summarily dismiss all of them in a single paragraph without any attempt to undertake the detailed, rigorous analysis required by the Service's PECE

Policy.  PBPA reminded the Service that, in past listing decisions, it had fully justified its decision *not* to list a species by reference to the results of a mandatory PECE analysis, which was intended by the Service to fulfill precisely that purpose, and PBPA urged the Service to follow its policy and practice for the LPC.

127.    PBPA also rebutted the analysis the Service provided in its summary dismissal of LPC conservation efforts.  Contrary to the Service's assertion that LPC conservation efforts were limited in size or duration, PBPA provided examples demonstrating that such efforts cover enormous tracts of land totaling millions of acres in the LPC range over all five states, including high priority LPC habitats.  The examples of conservation efforts addressed oil and gas activities, ranching, and farming, and showed that the durability of these efforts is demonstrated by steadily increasing landowner enrollment in those programs.

128.    Similarly, PBPA countered the Service's dismissal of LPC conservation efforts as "voluntary" with "little certainty that the measures will be implemented."  In fact, as PBPA noted, some of those efforts are legally binding and others contain significant incentives for implementation similar to those specifically recognized in the Service's PECE Policy, including the incentive of having conservation efforts fully considered under that policy as a basis for not listing the species.  PBPA pointed out that, in contrast to the decision-making process that led the Service to not list the Dunes Sagebrush Lizard based upon voluntary conservation efforts, *see* FWS, Withdrawal of the Proposed Rule to List Dunes Sagebrush Lizard, 77 Fed. Reg. 36,872 (June 19, 2012), it would be arbitrary for the Service to forgo a PECE analysis and thereby avoid considering a decision not to list the LPC.

129.    Finally, PBPA stressed that the Service was wrong in summarily dismissing LPC conservation efforts because it concluded those efforts were not "effective."  PBPA pointed out

that experts in LPC biology, including the Service's own biologists, had developed and participated in the Service's approval of those conservation efforts.  In particular, the Service had previously acknowledged that the NRCS's broad-based LPCI "will result in ameliorating, minimizing, or eliminating potential adverse effects," had concluded that the BLM Special Status Species Resource Management Plan Amendment had "a track record showing the implementation and effectiveness of that conservation effort," and had approved a 2008 New Mexico CCAA/CCA for the oil and gas industry that served as the model for the new 5-state oil and gas CCAA, which would cover a vast area and produce millions of dollars for the highest priority conservation projects.

130.    PBPA also provided data and analysis to refute the Service's overall conclusion that the LPC should be listed as threatened as a "result of continued population declines predicted into the foreseeable future."  *See* 77 Fed. Reg. at 73,851.  PBPA pointed out that the Service's own data demonstrate a relatively stable LPC population over the past fifty years, with an increasing trend from 2003 through the present, and that the current population estimate was in line with the population levels of the mid-1960s, which followed extreme droughts in the 1930s and 1950s.  PBPA brought to the Service's attention two recent analyses showing that the species: (a) had increased nearly 11 percent since 1997; (b) had a low (<0.0001%) probability of extinction, and a high probability of persistence and population growth in certain ecoregions, including the shortgrass ecoregion and sand shinnery oak ecoregion; and (c) those predictions should be regarded as conservative because they did not consider the future beneficial impacts of ongoing and planned LPC conservation efforts.

131.    Likewise, PBPA disputed the Service's conclusion that factors affecting the LPC's habitat and range "have not been abated," pointing to massive, effective conservation

efforts and the results of those efforts.  PBPA pointed out evidence provided by the NRCS: "[t]he most recent National Agricultural Statistics Service (NASS) geospatial data indicates that native rangeland has increased by more than 1 million acres since 2008 across the EOR [estimated occupied range]," and that there has been a 25 percent gain in EOR since 2000.

132.   With respect to the Service's assertion that fence-collision mortality is an important source of adverse impacts on LPCs, PBPA provided evidence that: (a) studies found no evidence of LPC fence-collision mortalities in an area encompassing substantial areas of West Texas, (b) a recent NRCS report showed that collisions with fences and transmission lines would "be inconsequential to overall population dynamics," and (c) studies indicate that ongoing and planned conservation efforts, such as fence marking, will effectively mitigate any collision mortality concerns.

133.   PBPA extensively refuted the Service's conclusion that infrastructure associated with petroleum production presents a "significant threat to the species into the foreseeable future."  *See* 77 Fed. Reg. at 73,875.  PBPA pointed out that the Service had erroneously relied upon a study to conclude that future development would dramatically increase habitat fragmentation.  The study concluded that a 16-fold increase in habitat fragmentation occurs when well spacing is reduced from 320 acres to 20 acres.  77 Fed. Reg. at 73,875.  PBPA explained that this was incorrect because, due to the oil and gas industry's dramatically increased use of horizontal drilling, modern operations frequently utilize a single pad for 10 or more wells.  In addition, PBPA made clear that the studies the Service relied upon: (1) used data pertaining to sage grouse without any evidence showing those data could be applied to LPC; (2) were at least seven years old and relied upon even older data; and (3) were grossly mischaracterized by the Service.

134.    Finally, PBPA pointed out that the Service, while concluding that livestock grazing has reduced the suitability of some LPC habitat, had failed to address conservation measures and efforts with respect to grazing.  As part of the LPCI, NRCS has implemented a conservation practice for prescribed grazing which it expects to benefit the LPC, and has indicated the practice will be implemented on a total of ***20 million acres***.  The New Mexico CCA/CCAA and Texas CCAA provide for similar measures.

135.    On June 20, 2013, PBPA and several of its members submitted comments on the Service's proposed special rule under Section 4(d) of the ESA.  *See* FWS, Listing the Lesser Prairie-Chicken as a Threatened Species With a Special Rule, 78 Fed. Reg. 26,302 (proposed May 6, 2013).  Again, PBPA commented that the Service had given short shrift to the extensive array of existing conservation strategies and reiterated its request that an extension of time be granted.  PBPA, Comments on May 6, 2013 Proposed 4(d) Rule, 4-6 (June 20, 2013), FWS-R2-ES-2012-0071-0442.

136.    On January 10, 2014, PBPA submitted comments on the Service's proposed revised special rule under Section 4(d).  *See* FWS, Listing the Lesser Prairie-Chicken as a Threatened Species With a Special Rule, 78 Fed. Reg. 75,306 (proposed Dec. 11, 2013).  PBPA highlighted PBPA member companies' involvement in the development of the RWP and the Service's recognition of the RWP's value as a comprehensive conservation program, as well as the Service's publication of the proposed oil and gas CCAA.  PBPA, Comments on December 11, 2013 Proposed 4(d) Rule, 2 (Jan. 10, 2014), FWS-R2-ES-2012-0071-0542.

137.    In the January 2014 round of comments, several commenters, including members of PBPA, specifically requested an extension of time until June 11, 2014, for the Service to make its listing decision.

**(2) *Plaintiff Counties and Other Federal, State, and Local Representatives***

138.    Since 2012, Plaintiff Counties have each passed resolutions opposing the listing of the Lesser Prairie-Chicken.  *See* Eddy County Resolution No. R-12-72 (Oct. 2012); Chaves County Resolution No. R-12-04 (Dec. 2012); Lea County Resolution 13-February-008R (Feb. 2013); Roosevelt County Resolution No. 2014-25 (May 2014).

139.    Chaves County, either individually or as part of a coalition of counties, commented multiple times throughout the Service's listing process, including, but not limited to: in-person comments at the February 12, 2013 hearing held by the Service in Roswell, New Mexico, and comments on the revised proposed 4(d) rule on January 9, 2014.  *See* Roswell, New Mexico Hearing Transcript, 40 (Feb. 12, 2013), FWS-R2-ES-2012-0071-0379; Chaves County Comments on Proposed Listing with Special Rule (Jan. 9, 2014), FWS-R2-ES-2012-0071-0530.

140.    Roosevelt County, both individually and as part of a coalition of counties, participated in the Service's listing process.  Roosevelt County representatives spoke at the February 2013 Service hearing in Roswell, New Mexico, and expressed opposition to the proposed listing.  *See* Roswell, New Mexico Hearing Transcript, 55-56.  On March 11, 2013, Roosevelt County submitted a comment letter to the Service.  *See* Roosevelt County Comments on Proposed Listing (Mar. 11, 2013), FWS-R2-ES-2012-0071-0204.

141.    Eddy County, both individually and as part of a coalition of counties, participated in the Service's listing process. The Eddy County Board of Supervisors submitted comments opposing the proposed listing to the Service on January 3, 2014.  *See* Eddy County Comments on Listing with Special Rule (Jan. 3, 2014), FWS-R2-ES-2012-0071-0584.

142.    Lea County, both individually and as part of a coalition of counties, participated in the Service's listing process.  Lea County notified the Service of its resolution opposing the

listing and requested a direct meeting with the Service about the proposed listing. Lea County representatives spoke at the February 2013 Service hearing in Roswell, New Mexico and expressed opposition to the proposed listing. *See* Roswell, New Mexico Hearing Transcript at 61

143.   Eddy and Chaves Counties also submitted comments on the proposed listing and the proposed Section 4(d) rule as part of the Coalition Of Arizona/New Mexico Counties For Stable Economic Growth. *See* Coalition Comments on Proposed Listing (Mar. 11, 2013), FWS-R2-ES-2012-0071-0444; Coalition Comments on Proposed 4(d) Rule (June 30, 2013), FWS-R2-ES-2012-0071-0268.

144.   At the Service's hearing in Roswell, New Mexico, Eddy County representatives expressed opposition to listing and concern for the Eddy County economy if the Lesser Prairie-Chicken were to be listed. *See* Roswell, New Mexico Hearing Transcript, 41, 51-52.

145.   On July 11, 2013, Dr. Benjamin Tuggle, Director of FWS Southwest Region, attended an eight-county coordination meeting held in Chaves County relating to the proposed listing of the LPC. At that meeting, Plaintiff Counties presented information to Dr. Tuggle regarding specific and multiple conservation measures that were not considered prior to issuing the proposed listing, including information demonstrating that the State of New Mexico and BLM had already placed over two million acres into conservation plans in New Mexico. Upon information and belief, the information presented to the Service at the July 2013 coordination meeting of the Counties was not evaluated by or accounted for by the Service in the Listing Decision.

146.   Plaintiff Counties engaged a biologist to evaluate the Service's proposed listing, and in its comments:   provided evidence of the stability of the LPC; refuted many of the

Service's claims regarding potential threats to the LPC; and highlighted the multitude of programs and efforts implemented at both the state and local levels to protect the LPC.

147.    Residents in Plaintiff Counties have been active participants in conservation efforts for the Lesser Prairie-Chicken habitat.

148.    As of March 2013, Roosevelt County had 13 ranches enrolled in CCAAs that cover 158,678 acres.  As of March 2013, the NRCS office located in Portales, New Mexico had 40 active contracts for the Lesser Prairie-Chicken conservation work in Roosevelt, Chaves, and Lea Counties that covers 666,400 acres.

149.    The Governors in all five states with occupied habitat for the Lesser Prairie-Chicken (Texas, New Mexico, Oklahoma, Kansas, and Colorado), along with many of the commissions and agencies within those states, opposed listing of the Lesser Prairie-Chicken. More than twenty-five Members of Congress, including all Senators from the five affected states, provided comments or communications with the Service opposing listing of the Lesser Prairie-Chicken.  More than thirty-two cities and counties in the five-state area commented, all opposing the listing of the Lesser Prairie-Chicken.  Numerous state senators and representatives provided comments, all opposing the listing of the Lesser Prairie-Chicken.  Numerous local conservation districts provided comments, all opposing the list of the Lesser Prairie-Chicken.

150.    Upon information and belief, no local or state government provided comments supporting listing of the Lesser Prairie-Chicken.

*(3) WAFWA*

151.    On September 18, 2013, the five states comprising WAFWA provided a submission to the Service in an effort to facilitate the Service's evaluation of the RWP as

required by the PECE Policy.[16]   The WAFWA submission discussed in detail each of the 15 evaluation criteria set forth in the Policy.  WAFWA explained that the RWP provided incentives for participants "to conserve LPC habitat to potentially preclude listing of the LPC."  WAFWA assured the Service as to each criterion under the PECE Policy that the RWP will be implemented and will be effective.

152.    WAFWA also submitted comments on the proposed listing on March 11, 2013, and February 12, 2014.   In the March 2013 comments, WAFWA explained that the Lesser Prairie-Chicken is not now, or in the foreseeable future, at risk of extinction or likely to become endangered in all or a significant portion of its range, and provided a 2012 study to demonstrate this. WAFWA further explained how extreme population fluctuations and temporary range expansions are the norm for the Lesser Prairie-Chicken and that because of existing Farm Bill Programs and other conservation efforts, the Lesser Prairie-Chicken population has been able to maintain itself as a sustainable population on the landscape at a higher level than what it did during other severe drought events, such as those in the 1930s. WAFWA also noted that, contrary to the Service's statements throughout the proposed listing which asserted that the Lesser Prairie-Chicken is dependent on large, unfragmented, native rangelands, both ground-based and aerial survey information indicates this assumption is flawed because moderately fragmented areas can hold large populations of Lesser Prairie-Chickens.

153.    In its February 2014 comments, WAFWA described the RWP and described its implementation, including the companies that had already enrolled.

---

[16]      Letter from WAFWA Representatives to D. Ashe, FWS (dated Sept. 18, 2013), *available at* http://www.wafwa.org/documents/RWPFinalSubmittalLetter20130918.pdf.

**F. The Final Listing Decision and Special 4(d) Rule**

154.    On April 10, 2014, the Service published its final determination and listing of the LPC as a threatened species throughout its range.  79 Fed. Reg. at 19,974.  The Service said the primary factors supporting the determination of threatened status for the LPC are the "ongoing and probable future impacts of cumulative habitat loss and fragmentation" as a result of conversion of grasslands to agricultural uses, encroachment by invasive plants, wind energy development, petroleum production, and the presence of various manmade structures, buildings, and roads.  *Id*.

155.    Upon information and belief, the Service did not prepare, make available to the public, or discuss in its Listing Decision any analysis of the 15 evaluation criteria set forth in its PECE Policy for considering the benefits to the LPC of the myriad ongoing and planned conservation efforts for LPC in terms of how those benefits affect the Listing Decision.

156.    The Service stated that it evaluated the RWP under the PECE criteria, 79 Fed. Reg. at 19,980, but it did not provide that evaluation for public scrutiny.

157.    Instead, the Service provided a five-paragraph summary presenting conclusions and assertions to support its rejection of the RWP as a basis for deciding not to list the LPC as threatened.  *Id*.

158.    The Service's summary asserted that the Service is uncertain about aspects of the RWP such as timing, location of benefits, enrollment, and funding.  The summary did not provide analysis or explanation as to the source or nature of its uncertainty or any data demonstrating that its uncertainty is justified.

159.    As noted in its special 4(d) rule issued the same day as the Listing Decision, the Service determined that "[t]o the extent that there may be uncertainty as to the effectiveness of

the strategy, the [RWP] contains adaptive management provisions that allow flexibility in its implementation over time to ensure that the plan results in improvement of the status of the species towards the habitat and population goals therein."  79 Fed. Reg. at 20,081.

160.    In addition, at the time the Service approved the RWP CCAA, the Service determined that the conditions in the RWP CCAA "are expected to 1) result in an increase in [LPC] populations throughout the currently occupied range, 2) maintain and expand the current distribution of the [LPC] across its estimated occupied range, and 3) increase population numbers that will result in more sustainable long-term populations within each of the four delineated ecoregions."  Conference Opinion for RWP CCAA Permit, 49.

161.    The Service provided no indication that it had undertaken any PECE analysis of the dozens of other LPC conservation efforts being planned or implemented in terms of how the benefits of those efforts, especially habitat improvements to millions of acres within the LPC range, affect the Listing Decision.

162.    The Service provided no indication that it had undertaken any PECE analysis of the cumulative benefits that could be expected from implementation of the RWP together with the other conservation efforts being planned or implemented, in terms of how those benefits, especially habitat improvements to millions of acres within the LPC range, affect the Listing Decision.

163.    In explaining the way in which it considered the PECE Policy for LPC in its response to comments by PBPA and others, the Service mischaracterized its PECE Policy in a manner that negated the Policy's applicability to conservation efforts that have not yet been fully implemented.

164.    The PECE Policy was designed to evaluate the expected benefit of "conservation efforts that have not yet been implemented or have been implemented, but have not yet demonstrated whether they are effective."  68 Fed. Reg. at 15,113.  According to the policy, such efforts may make listing unnecessary if the Service has "sufficient certainty that the effort will be implemented and will be effective."  *Id*.

165.    In its Listing Decision for the LPC, however, the Service said such conservation efforts "must have reduced the threat [to the LPC] at the time of listing, rather than reducing the threat in the future . . . ."  79 Fed. Reg. at 19,986-87.  Likewise, in the Listing Decision, the Service said that implementation and effectiveness of a planned, unimplemented, or recent conservation effort will be judged by whether that effort "has resulted in reduction or elimination of one or more threats at the time of listing."  *Id*. at 19,987.

166.    In its final Listing Decision, the Service concluded that very little information exists regarding LPC population size prior to 1900, and that rangewide population estimates are nonexistent prior to 1960. The Service said that in the mid-1960s the rangewide population of LPC was estimated to be 36,000 to 43,000 birds. The Service indicated that in 1980 the LPC population estimate was 44,400 to 52,900 birds, and that in 2003 it was 32,000 birds. The 2012 estimate was 34,440 birds, but the Service catalogued numerous reasons why estimates, such as the 2012 estimate, could fail to account for all existing birds due to the shortcomings of aerial surveys utilizing the lek-counting method. Even so, the Service said "[t]he aerial surveys conducted in 2012 . . . provide the best estimate of current population size."  79 Fed. Reg. at 20,010.

167.    The Service explained that LPC populations "can fluctuate considerably from year to year, a natural response to variable weather and habitat conditions."  *Id*. at 20,015.

Accordingly, the Service said "[i]n some instances, short-term analyses could reveal statistically significant changes from one year to the next but actually represent a stable population when evaluated over longer periods of time." *Id*.

168.    The 2013 aerial surveys resulted in a population estimate of 17,616 birds. *Id*. at 20,011. The Service apparently mistrusted this estimate because, as noted, it determined that the 2012 estimate of 34,400 birds is the "best estimate of current population size." *Id*. at 20,010.

169.    In discussing LPC habitat and range, the Service repeatedly stressed that the current occupied range represents about an 84-percent reduction since pre-European settlement, which had led to cultivated agriculture and many other human activities. The Service did not respond to PBPA's comment that NRCS has reported data demonstrating a 25 percent increase in the LPC estimated occupied range since 2000.

170.    The Service stated that, in 2007, the State conservation agencies estimated that the occupied range of the LPC was 25,101 square miles. *See* 79 Fed. Reg. at 20,009. It indicated that the estimated occupied range is now believed to encompass 27,259 square miles. *Id*. This represents an 8.6 percent increase in the estimated occupied range between 2007 and 2013. This represents nearly a ***three-fold increase*** in the estimated occupied range between 1980 and 2013.

171.    The Service did not directly respond to the PBPA comment that the Service had grossly mischaracterized data on well drilling and had ignored technological developments that facilitated horizontal drilling and reduction in surface disturbance that could otherwise result from increased well density in LPC habitat. Instead, the Service repeated its erroneous assertion that increases in well density would result in a 16-fold increase in habitat fragmentation due to petroleum production. 79 Fed. Reg. at 20,053.

172.    In the Listing Decision, the Service determined that designating critical habitat is prudent, and outlined a plan for designating critical habitat within a year.  *Id*. at 20,069.

## VI.  CLAIMS FOR RELIEF

173.    Plaintiffs reallege and incorporate by reference the allegations of all preceding paragraphs.

174.    The Service's decision to list the Lesser Prairie-Chicken as threatened is a final agency action which is subject to judicial review by this Court under the Administrative Procedure Act.

175.    By listing the Lesser Prairie-Chicken as a threatened species under the ESA, the Service violated the APA.  The Service's Listing Decision is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law and without observance of procedure required by law pursuant to the Administrative Procedure Act.

## CLAIM I

### Failure to Perform PECE Policy Analysis

176.    Pursuant to its PECE Policy, the Service had committed to evaluating conservation efforts in deciding whether to list species as endangered or threatened.  68 Fed. Reg. 15,100.  The PECE Policy requires the Service to evaluate 15 specific criteria in order to determine whether conservation efforts are likely to be implemented and effective in the future. *Id*. at 15,114-15.

177.    Despite receiving numerous comments that explained why it must meet this commitment and provided detailed information to facilitate the evaluation, the Service failed to develop and publish a PECE Policy evaluation of the many planned and existing LPC conservation efforts, both individually and cumulatively.  The Service's failure to perform and

publish these evaluations is in violation of its PECE Policy.  By failing to undertake and consider the required PECE analysis as part of its Listing Decision, the Service failed to consider an important aspect of the listing, and its decision is not based on consideration of all relevant factors.

178.    In its Listing Decision, the Service negated the purpose and intended effect of its PECE Policy by requiring that, in order to have an impact on the Service's Listing Decision, planned conservation efforts, as well as existing conservation efforts whose effectiveness had not yet been demonstrated, must have already resulted in reduction or elimination of threats to the LPC at the time of the Listing Decision.  In so doing, the Service violated its PECE Policy, erected an irrational barrier to the required consideration of such conservation efforts, failed to consider all relevant factors, and failed to consider an important aspect of the listing.

179.    For these reasons, the Service decision to list the LPC as a threatened species under the ESA is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law and without observance of procedure required by law.  The Service's Listing Decision violates the Administrative Procedure Act.  This Court should hold unlawful and set aside the Listing Decision.

## CLAIM II

### Failure to Formulate and Explain a Rational Decision Based Upon the Evidence

180.    In its Listing Decision, the Service found that the current population of the LPC is only slightly below the population estimates of the mid-1960s and 7.5 percent above the population estimate for 2003. The Service found that the estimated occupied range of the LPC has increased from 25,101 square miles in 2007 to 27,259 square miles in 2013, an 8.6 percent increase, and that the estimated LPC occupied range nearly tripled between 1980 and 2013.  The

Service also determined that the RWP will provide conservation benefits to the LPC, and has approved the RWP CCAA and other CCAs and CCAAs.

181.   Contrary to this evidence, the Service asserted that the species has a reduced population size and faces ongoing habitat loss and degradation.  The Service concluded that, without intervention, population numbers will continue to decline and the range of the species will continue to contract.  The Service did not provide a rational justification for why its documented increases in both population and range over the course of the last decade—either alone or in combination with the significant habitat-conservation and other mitigation efforts being undertaken and planned by governmental and private entities across the LPC range—could not or did not lead to the conclusion that the LPC is ***unlikely*** to become in danger of extinction in the foreseeable future. Accordingly, the Service's Listing Decision and rationale run counter to the Service's evidence, and the Service failed to provide a satisfactory explanation for its decision that sets forth a rational connection between the facts it found and the choice it made.

182.   For these reasons, the Service decision to list the LPC as a threatened species under the ESA is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law and without observance of procedure required by law.  The Service's Listing Decision violates the Administrative Procedure Act.  This Court should hold unlawful and set aside the Listing Decision.

### CLAIM III

### Failure to Respond to Comments

183.   The Service failed to respond to significant and highly relevant comments provided by PBPA and Plaintiff Counties.  In its comments, PBPA, among other things, informed the Service that it was incorrect in concluding that increased well density in oil and gas

operations would result in a corresponding increase in LPC habitat fragmentation because horizontal drilling dramatically reduces such impacts.  The Service did not respond to this comment, and instead repeated its erroneous conclusion.  Likewise, the Service did not respond to Plaintiff Counties' comments. The Service's failure to respond violates the Administrative Procedure Act.  5 U.S.C. § 553(c).

184.    For these reasons, the Service decision to list the LPC as a threatened species under the ESA is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law and without observance of procedure required by law.  The Service's Listing Decision violates the Administrative Procedure Act.  This Court should hold unlawful and set aside the Listing Decision.

## VII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment providing the following relief:

185.    Order, declare, and adjudge that the Defendants have violated the Administrative Procedure Act in issuing the April 10, 2014 final Listing Decision and deciding that the Lesser Prairie-Chicken is a threatened species under the Endangered Species Act;

186.    Declare that Defendants' actions, as set forth above, are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law and without observance of procedure required by law pursuant to the Administrative Procedure Act;

187.    Hold unlawful and set aside the Listing Decision;

188.    Grant such other and further relief as may be requested hereafter by Plaintiffs, or as the Court deems necessary and appropriate.

DATED:        June 9, 2014

Respectfully submitted,

LYNCH, CHAPPELL & ALSUP
A Professional Corporation
The Summit, Suite 700
300 North Marienfeld
Midland, Texas 79701
Telephone: 432/683-3351
Telecopier: 432/683-2587


By:        /s/Harper Estes
Harper Estes
State Bar No. 00000083
Lisa K. Hooper
State Bar No. 24047282

*Counsel for Plaintiffs Permian Basin
Petroleum Association, and Chaves,
Roosevelt, Eddy and Lea County, New
Mexico*


On Behalf Of:

James T. Banks
Joanne Rotondi
HOGAN LOVELLS US LLP
555 Thirteenth St., NW
Washington, DC 20004
(202) 637-5600

Jennifer L. Biever
HOGAN LOVELLS US LLP
1200 Seventeenth Street
Suite 1500
Denver, Colorado 80211
Telephone:  (303) 454-2410
Facsimile:  (303) 899-7333

*Counsel for Plaintiff
Permian Basin Petroleum Association*