IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND-ODESSA DIVISION

| | | |
|---|---|---|
| PERMIAN BASIN PETROLEUM ASSOCIATION, CHAVES COUNTY, NEW MEXICO, ROOSEVELT COUNTY, NEW MEXICO, EDDY COUNTY, NEW MEXICO AND LEA COUNTY, NEW MEXICO, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | MO-14-CV-050 |
| DEPARTMENT OF THE INTERIOR, U.S. FISH AND WILDLIFE SERVICE, SALLY JEWELL, AND DANIEL M. ASHE, | ) ) ) ) | |
| Defendants. | ) | |

BRIEF *AMICUS CURIAE* OF KANSAS NATURAL RESOURCE COALITION
IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

*Amicus Curiae,* the Kansas Natural Resource Coalition ("KNRC"), submits this Brief in support of Plaintiffs' Motion for Summary Judgment, which asserts that the U.S. Fish and Wildlife Service ("FWS") violated the Administrative Procedure Act (APA) in promulgating a Final Rule that listed the Lesser Prairie-Chicken (LPC) as a threatened species under the Endangered Species Act, 16 U.S.C. § 1531 *et seq.* (ESA). Final Rule, 79 Fed. Reg. 19,974 (April 10, 2014). KNRC is uniquely positioned to demonstrate that FWS failed to evaluate protections afforded the LPC by State and local government conservation programs and that the agency violated the APA by ignoring substantive evidence of the protections these efforts afforded the LPC. Because the Final Rule impacts so many State and local governmental entities, counties, and tax bases, KNRC's Brief is crucial to a proper understanding of the issues raised by this litigation.

\\\.                                     1

This Brief describes substantive interactions between KNRC and FWS, in which KNRC demonstrated, to no avail, an extensive, collaborative, and ongoing commitment to LPC conservation by local governments in rural western Kansas. The KNRC's experience with FWS is not unique; indeed it is consistent with that of many other local governmental bodies, including the four Plaintiff New Mexico counties, throughout the LPC's five-State, occupied range. (Complaint ¶¶ 9-12). Effective, ongoing and comprehensive conservation programs occurring at the grassroots level were documented for FWS and in the public record. These initiatives clearly demonstrated that federal listing of the LPC was not warranted. The experience of KNRC and other governmental bodies reinforces Plaintiffs' positions that: (1) FWS failed to comply with its obligation to evaluate and rigorously analyze the cumulative, positive contribution that conservation efforts at the State and local levels were having on protecting the LPC; and, (2) FWS acted arbitrarily, capriciously, and contrary to law by listing the LPC because it ignored a critical aspect of that decision, by failing to take into account the effect of multiple conservation efforts underway by State and local governments.

## INTEREST OF AMICUS CURIAE

KNRC is a collaborative group of 32 Boards of County Commissioners of counties that occupy the western geographic one-third of Kansas.[1] KNRC counties contain the vast majority (>75%) of the LPC population and more than 45% of the quality habitat in the five-state LPC region, and greater than 80% of the LPC's range in Kansas. *See* 79 Fed. Reg. at 19,994. The 32 counties organized KNRC to coordinate their natural resource conservation and environmental programs with Federal and State governmental agencies, to promote balanced and effective

---

[1] Clark, Comanche, Edwards, Ellis, Finney, Ford, Gove, Graham, Grant, Hamilton, Haskell, Hodgeman, Kearny, Kiowa, Lane, Logan, Meade, Morton, Ness, Pawnee, Rooks, Rush, Scott, Seward, Sheridan, Sherman, Stanton, Stevens, Thomas, Trego, Wallace, and Wichita Counties.

administrative policymaking, and to serve as a unified voice and a conduit between agencies and their county constituents. KNRC's Mission Statement defines its goals as "monitoring, analyzing, understanding, communicating and participating in those initiatives that materially affect the natural or human systems governed by individual member counties." Natural and human resources -- and potential government regulations affecting them -- are of crucial importance to the communities and individual residents of these counties, and their customs and culture. KNRC thus represents a vast geographic area of front-line stakeholders who are directly affected by, and have a material interest in, FWS's LPC listing decision.

During the multi-year administrative process leading up to FWS's decision to list the LPC, KNRC actively participated by providing locally-available data, plans, testimonials, and scientific data. These contributions included:

--    Multiple comments to the FWS rulemaking docket[2] and meetings with FWS policy officials, both in the region and in Washington, detailing the significance of local conservation plans, programs, and efforts throughout the area.

--    Adopting a Conservation, Management, and Study Plan for the LPC which sought to preserve, maintain, and increase LPC populations in balance with the human environment. The Preamble to the Final Rule recognized several local conservation efforts being undertaken by the Coalition or its member counties in major conservation categories. *Id.* at 19,994.

--    Conducting a formal, two-day Public Hearing during the comment period to take expert testimony, receive information on the impact and efficacy of conservation efforts, and to understand the implications of the FWS listing proposal in the context of human and natural systems.

KNRC's work with LPC conservation activities was recognized in February 2014 by a Congressional Working Group tasked with evaluating the effectiveness of ESA:

A coalition of 32 Kansas counties affected by the potential listing of LPC prepared its own plan and submitted it to the FWS. These counties have objected

---

[2] Comments of Kansas Counties by J. R. Carlson
http://www.regulations.gov/#!documentDetail;D=FWS-R2-ES-2012-0071-0226.

\\\.                                                           3

to the FWS' settlement-driven deadlines to list species without proper coordination with county governments where proposed ESA listings occur.[3]

KNRC is, therefore, vitally interested in this litigation and is well positioned to provide this Court with valuable information to assist in the resolution of this matter

## SUMMARY OF ARGUMENT

1. The Final Rule violates APA because FWS did not comply with its legal obligation that, when deciding whether to list the LPC, it must evaluate current or planned conservation efforts by State and local governments *throughout* the LPC's range and conduct a rigorous review to determine whether they make listing unnecessary.

As FWS has recognized, effective conservation planning and implementation must rely extensively on efforts undertaken at the *local* level. *See* Notice of Proposed Rulemaking, 77 Fed. Reg. 73,828, 73,836 (Dec. 11, 2012) (implementation of State, local, and private conservation efforts is "crucial to Lesser Prairie-Chicken conservation.") By mandating rigorous consideration of conservation efforts by States and their political subdivisions, Congress sought to reduce imposition of top-down, command-and-control federal regulation under ESA. Instead, it sought to encourage participative conservation planning methods, activities, and programs that enjoyed and elicited local support. Congress also sought to ensure listing decisions would be informed by the experience of those who have day-to-day contact with the species and its habitat -- those who decidedly are in the best position to understand the relationship between the natural environment and human activities affected by the listing decision.

FWS recognized this principle more than a decade ago by adopting, after notice and comment rulemaking, its Policy for Evaluation of Conservation Efforts (PECE). 68 Fed. Reg.

---

[3] Endangered Species Act Congressional Working Group, *Report, Findings and Recommendations* 46 (Feb. 4, 2014)
http://valadao.house.gov/uploadedfiles/esaworkinggroupreportandrecommendations.pdf.

15,100 (March 28, 2003). The PECE implements the FWS' obligation to consider, when making a listing decision, "all conservation efforts being made to protect a species …," including those being undertaken by State and local governments. *Id*. In deciding whether to list the LPC, however, FWS failed to comply with the provisions of PECE. This violation of its obligations violates APA and of itself requires that the Final Rule be declared invalid. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("An agency may not … depart from a prior policy *sub silentio* or simply disregard rules that are still on the books.")

2. Because it systematically failed to give a proper degree of consideration to extensive documentation submitted by State and local governments concerning ongoing LPC conservation and protection programs, including but not limited to those submitted by KNRC, FWS' listing decision lacks a rational basis in the record and as a result is arbitrary and capricious.

The Preamble to the Final Rule describes at length extensive conservation efforts undertaken by State and local governments; however, in reaching its conclusion, FWS dismissed these viable programs in a single, conclusory paragraph. *See* 79 Fed. Reg. at 19,998. In so doing, the agency did not point to any document(s) in which it purportedly conducted a systematic analysis of the large number of local conservation programs already underway, nor did it rigorously consider how the benefits of those efforts affected the statutory factors governing its listing decision. *See Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("Normally an agency rule would be arbitrary and capricious if the agency has … entirely failed to consider an important aspect of the problem …")

In failing to follow a mandatory requirement or give meaningful consideration to ongoing conservation efforts, FWS violated APA. KNRC's submissions to FWS accurately identified

and predicted socioeconomic impacts on the communities of rural Kansas that would result from such a flawed listing determination. Nonetheless, the agency acted in a manner that already is causing substantial and avoidable harm to the human environment throughout the LPC range.

## ARGUMENT

### I. FWS VIOLATED APA BY NOT CARRYING OUT ITS OBLIGATION TO EVALUATE PROTECTIONS AFFORDED THE LPC BY STATE AND LOCAL GOVERNMENT CONSERVATION PROGRAMS

FWS has long recognized that, in making listing decisions, it has an obligation to consider "all conservation efforts being made to protect a species …," including "conservation efforts … developed by … State and local governments …." 68Fed. Reg. at 15,100. The mechanism implementing its conservation-review obligation is the PECE. That Policy established systematic criteria the agency is required to employ in assessing the efficacy of ongoing conservation efforts or proposed conservation plans. These factors explicitly include how "formalized conservation efforts that *have yet to be implemented or to show effectiveness* contribute to making listing a species as threatened or endangered unnecessary." *Id*. (emphasis added); *see id*. at 15,103. The PECE contains criteria for determining the effectiveness of these conservation efforts, and thereby informs "states and other entities that are developing agreements or plans … the criteria we will use in evaluating formalized conservation efforts when making listing decisions …." *Id*. at 15,101.

In applying the PECE to the LPC listing, FWS unlawfully narrowed and limited its scope. Specifically, without providing prior notice and an opportunity for public comment, FWS significantly and improperly limited the consideration of State and local conservation programs undertaken for the very purpose of protecting the LPC. FWS simply ruled that when considering whether a conservation program provides a basis for not listing a species, those conservation

\\\.                                6

efforts not yet implemented, or those that have been implemented but have not been demonstrated effective at the time of listing, are essentially inapplicable. FWS ruled that a program "must have reduced the threat at the time of listing, rather than reducing the threat in the future" before it merited consideration. *Id*. at 19,986-87. Application of this revision of the PECE was arbitrary and capricious and violated APA. *See Fox Television Stations,* 556 U.S. at 515:

> To be sure, the requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position. An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard Rules that are still on the books.

Further, the Preamble recites at length record evidence concerning the extensive conservation efforts that had been undertaken by State and local governments across the five-State range of the LPC. *See e.g.,* 79 Fed. Reg. at 19,988-98. However, in one cursory paragraph, the agency dismissed those efforts with the back of its hand without making or citing to any meaningful evaluation of those local programs, or describing how it had, in fact, conducted a rigorous assessment consistent with its own PECE. Instead, FWS relied upon conclusory generalities:

> In summary, a variety of important conservation efforts have been undertaken across the range of the [LPC]. These actions . . . have, at least in some instances, slowed, but not halted, alteration of [LPC] habitat. In many instances, these efforts have helped reduce the severity of the threats to the species, particularly in localized areas. Continued implementation of these and similar future actions is crucial to [LPC] conservation. However, our review of these conservation efforts indicates that most of the measures identified are not adequate to fully address the known threats, including the primary threat of habitat fragmentation, in a manner that effectively reduces or eliminates the threats. All of the efforts are limited in size or duration, and the measures typically are not implemented at a scale that would be necessary to effectively reduce the threats to this species across its known range.

Id. at 19,998.

In other words, after first paying lip service to the importance of making a reasoned evaluation of the strength and effectiveness of State and local conservation efforts, FWS first disregarded and then ultimately excluded from consideration the extensive evidence of the cumulative effects of conservation programs across the five-State LPC region. It thus rendered an unlawful listing determination by improperly narrowing the facts it considered.

The difficulty KNRC experienced in communicating to FWS the effects of, and obtaining meaningful consideration of, conservation programs adopted across the Kansas LPC range illustrates a normative pattern encountered by many other local governments, , including the four Plaintiff New Mexico counties.

In its Final Rule, the FWS recognized that "[i]mplementation of recovery actions [including habitat restoration] generally requires the participation of a broad range of partners, including other Federal agencies, States, Tribal and nongovernmental organizations, businesses, and private landowners." *Id*. at 20,066. That statement, however, expresses a fatal blind spot in FWS' approach -- the agency ignored the essential contribution of local governments in species conservation efforts. Section 4(b)(1)(A) of the ESA, 16 U.S.C. § 1533(b)(1)(A), expressly provides that, in making listing decisions, FWS must consider the conservation efforts being undertaken by State and local governments.

> The Secretary [of the Interior] shall make determinations required by subsection (a)(1) [to list a species as endangered or threatened] solely on the basis of the best scientific and commercial data available to him after conducting a review of the status of the species and after taking into account those efforts, if any, being made by any State . . . *or any political subdivision of a State* . . . to protect such species . . . within any area under its jurisdiction . . . .

(Emphasis added).[4]

---

[4] Multiple Executive Orders also require that in exercising its authority, Interior must take into account local views concerning appropriate conservation measures. For example, Executive Order No. 13352, *Facilitation of Cooperative Conservation*, 69 Fed. Reg. 52,989 (Aug. 26,

The members of the KNRC are elected officials of political subdivisions of the State of Kansas in which the effects of listing the LPC will impact, resonate, and be realized for generations to come. FWS thus has a statutory obligation to take into account regional conservation efforts, not only in the Kansas counties but across the LPC's entire range.

To explain the extensive LPC conservation programs being undertaken in western Kansas, on September 11, 2013 KNRC hand-delivered two documents to the Deputy Assistant Director of FWS and legal counsel for the Department of Interior. These official land-use documents, called the *Natural Resource Coordination Plan of the KNRC*[5] and the *Lesser Prairie Chicken Conservation, Management and Study Plan of the KNRC*,[6] were formally adopted by Resolution into the ordinances of each individual KNRC member county.

The *Natural Resource Coordination Plan* outlines the principles, objectives, protocol, and implementation structure necessary to assess what natural resource conservation measures would be appropriate in the individual KNRC counties. The *Coordination Plan* also provides an effective link between federal agencies and local governments, with the stated goal of balancing natural and human systems in regulatory action. KNRC thereby sought to facilitate balanced decision-making that would promote LPC conservation in tandem with economic stability, social cohesiveness, protection of the public health and safety, and deference for regional custom and cultures.

---

2004), directs the Secretary to "implement laws relating to the environment and natural resources in a manner that promotes cooperative conservation, with *an emphasis on appropriate inclusion of local participation in Federal decisionmaking*. *Id*., § 1 (emphasis added). Section 3(a) further directs Interior to "carry out the programs, projects, and activities of the agency … that implement laws relating to the environment and natural resources in a manner that: … [p]roperly accommodates local participation in Federal decisionmaking …."

[5] *Natural Resource Coordination Plan of the KNRC,*
http://www.regulations.gov/#!documentDetail;D=FWS-R2-ES-2012-0071-0499.

[6] *Lesser Prairie Chicken Conservation, Management and Study Plan of the KNRC*,
http://www.regulations.gov/#!documentDetail;D=FWS-R2-ES-2012-0071-0499.

The *LPC Conservation, Management and Study Plan* incorporates and builds upon federal and State environmental programs, and provides mechanisms to facilitate, monitor, and coordinate local conservation efforts, long-term protection, and future study of the LPC. This Plan was designed to balance conservation activities with their effects upon natural and human environments. It provided information on current local conservation practices, and, within the context of the PECE, identified technical gaps in the data on which the FWS proposed to rely. The Plan also set forth a realistic local monitoring system for the LPC population.

The KNRC Plan thereby provided a viable, scientifically sound, and lower-cost approach to ensure continuously-improving, incremental conservation of the LPC. The Plan presented its analysis within the context of six focal areas KNRC had identified as being consistent with the PECE and threats identified by FWS in its Proposed Rule: (1) Monitoring and study of LPC populations; (2) LPC habitat and fragmentation; (3) Nest success near elevated structures; (4) Predation and inter-species competition; (5) Hunting; and, (6) Funding for LPC conservation programs. The Plan addressed specific, FWS-recognized conservation actions for invasive species control (trees), livestock range and management, fence marking, and habitat conservation and management. The Preamble to the Final Rule summarized the KNRC Plan as follows:

> The plan summarizes some of the available information regarding lesser prairie-chickens and has the stated goal of preserving, maintaining, and increasing lesser prairie-chicken populations in balance with and respect for human, private, and industrial systems within the . . . region under governance by the coalition members. The plan identified several conservation actions, such as prescribed fire, being undertaken by the coalition or its member organizations that fall with six major categories of conservation focus . . . .

*Id*. at 19,994.

In its Plans, prolific correspondence, and three in-person meetings with FWS policy officials (September 11, 2013, November 1, 2013, and February 7, 2014), KNRC repeatedly reminded FWS of its obligation to evaluate conservation programs adopted by local

\\\.                                                              10

governments.  For its part, FWS officials systematically dismissed its obligation to consider local conservation initiatives and refused to describe for KNRC the process or context, if any, in which the agency would contemplate their ongoing conservation efforts.  Rather, in its sole correspondence to KNRC throughout the listing process, FWS promised to evaluate the KNRC LPC Conservation Study, and Management Plan:  "Service Staff has reviewed the [KNRC] Study Plan and will be evaluating it in the context of our final LEPC listing determination."[7]  Contrary to its promise to evaluate -- through the lens of its own PECE -- KNRC's regional LPC conservation program, FWS acted arbitrarily and capriciously, as the Final Rule merely mentioned the presence and contents of the KNRC Plan, while ignoring its substance.

After extensive public notification in regional newspapers and electronic mail, and in-person notice to FWS officials, on November 7-8, 2013 KNRC convened a two-day Public Hearing in Garden City, Kansas on "the Advisability of Listing the Lesser Prairie Chicken as a Threatened Species under the Endangered Species Act."  The Public Hearing was convened to collect, receive, and document viewpoints, ascertain available scientific evidence, and assess the socioeconomic and tax implications of the proposed LPC listing.  The Hearing received testimony from State legislators, senior industry professionals, technical experts, and four county commissioners -- in addition to presentations from bankers, ranchers, real-estate professionals, and other witnesses who would be affected by the listing decision.

FWS officials at several levels were invited to attend the Public Hearing, but declined to participate, citing "budgetary constraints" and "prior commitments."

---

[7] March 24, 2014 letter from FWS Deputy Regional Director to KNRC President Ken J. Klemm, http://www.fordcounty.net/pdf%20Files/USFWS%20Response%20to%20KNRC%20November%2029%20Letter.pdf.

KNRC analyzed the transcripts of the Public Hearing and on January 29, 2014, published 249 conclusions drawn from the evidence at the Hearing in a Report entitled "Findings of Fact and Conclusions of Law."[8]  This Report and its findings from the Public Hearing were submitted to the public docket of the LPC rulemaking and on February 7, 2014, were hand-delivered to the Deputy Assistant Director of FWS and legal counsel for Interior.

The Findings of Fact and Conclusions of Law detailed the problematic science underlying the proposed listing; its socioeconomic impacts, tax implications, and creation of split-estate conflicts; the historical FWS neglect of effects on health, safety, and private property; and the efficacy of current, regional LPC conservation programs in western Kansas.

The 32 counties comprising KNRC were *not* the only governmental entities urging FWS to give meaningful consideration to their conservation efforts during the listing decision process. The Preamble to the Final Rule and the public docket suggest that KNRC's negative experience was shared by multiple State and local governments -- including the four New Mexico counties that are Plaintiffs in this lawsuit.  FWS simply defaulted on its legal duty to consider, in determining whether to list the LPC, the record evidence of the extensive efforts to protect the species and its habitat that State and local governments had undertaken.

KNRC therefore submits that the FWS violated APA by violating its obligations under the PECE in listing the LPC as a threatened species.

---

[8] Findings of Fact and Conclusions of Law of the Kansas Natural Resource Coalition *In re: The Advisability of Listing the Lesser Prairie Chicken as a Threatened Species Under the Endangered Species Act* (Jan. 29, 2014) http://www.regulations.gov/#!documentDetail;D=FWS-R2-ES-2012-0071-0608.

## II. THE LISTING VIOLATES APA BECAUSE FWS IGNORED A CRITICAL PART OF THE ISSUE – THE SUBSTANTIVE EVIDENCE OF PROTECTIONS AFFORDED THE LPC BY STATE AND LOCAL GOVERNMENT CONSERVATION PROGRAMS

The listing of the LPC as a threatened species was arbitrary, capricious, and contrary to law in violation of APA because FWS gave no weight -- indeed it disregarded -- the extensive body of evidence submitted by Federal, State and local governments, industry, agricultural associations, and the public that documented comprehensive conservation efforts that were being undertaken to conserve the LPC and protect its habitat throughout its range.

In determining under the APA whether an agency's rulemaking action was arbitrary and capricious, "[t]he function of the court is to assure that the agency has given reasoned consideration to all the material facts and issues."  *Greater Bost. Television Corp. v. FCC*, 444 F.2d 841, 851 (D.C. Cir. 1970).  As the Supreme Court stated in *State Farm*, 463 U.S. at 43:

> Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, *entirely failed to consider an important aspect of the problem*, [or] offered an explanation for its decision that runs counter to the evidence before the agency ….

(Emphasis added).  In listing the LPC, FWS violated APA by failing to take into account facts relevant to a critical aspect of the question whether listing the LPC was authorized under ESA. The agency erred by giving only superficial, cursory consideration to an extensive evidentiary record of conservation efforts for the LPC underway at the State and local levels; by failing to conduct rigorous analysis of that evidence; and by dismissing the significance of that evidence out-of-hand in concluding that listing the LPC was warranted.

For example, as set forth in the Complaint, the Plaintiff New Mexico counties demonstrated to FWS the important LPC conservation efforts being undertaken within their respective jurisdictions.  In its decision, however, the agency gave no consideration to their

explanation of the significance of local conservation programs being developed and implemented at the grass roots level to protect the species.

In a similar manner, the KNRC spent substantial time, effort, and a great deal of money in developing and presenting to FWS facts describing the magnitude and scope of local conservation efforts to protect the LPC in western Kansas. KNRC representatives made repeated written and oral presentations to the agency as to how these conservation initiatives would protect the LPC and its habitat in a manner that would balance both the natural and human environments. KNRC also described in detail to FWS, both in-person and in the public docket, the adverse effects that listing the LPC would have on the communities, citizens, industry, agriculture, culture, and customs of western Kansas. While the Final Rule recognized that KNRC had documented conservation actions underway within six major conservation categories, FWS gave no weight to these activities in reaching and justifying its decision. 79 Fed. Reg. at 19,994.

Again, KNRC's experience is illustrative but hardly unique. The unlawfulness of the FWS's decision does not arise solely from ignoring the evidence KNRC submitted. Rather, the arbitrary and capricious nature of the agency's action emanates from its wanton and systematic ignoring of <u>cumulative</u> submissions by a large number of State and local governments throughout the LPC's range about their conservation actions.

As FWS recognized in the Final Rule, the range occupied by the LPC in western Kansas has expanded significantly in recent years. 79 Fed. Reg. at 19,994, 20,013, 20,066. The KNRC's *Conservation, Management, and Study Plan* set forth examples of the habitat restoration and species protection efforts that had been implemented, and others that were being either studied or developed, to protect the LPC in western Kansas and gathered information

about the species and its habitat necessary to make a rational listing decision. These conservation actions included:

- *Habitat Restoration*. Beginning in 2005, a 5,000 acre tract in Finney County was restored to native LPC habitat. The near-contiguous, multi-use parcel was converted from agricultural use to mixed-grass, sand sagebrush habitat, and included underground placement of electrical lines. One objective of this initiative is to encourage similar projects in other mixed-grass, sand sagebrush habitat regions.

- *Invasive Species Control*. In 2013, as part of an aggressive invasive species and wildlife-habitat restoration program, Barber County scheduled the burning of several thousand acres, with over 100,000 acres ultimately planned for burning. The Eastern Red Cedar has been documented to present a *significant* threat to many forms of wildlife, including the LPC. Barber County maintains a tree-cutting program in which these trees are cut, chipped, and processed into pellet fuel for wood burning stoves. This step is followed by prescribed land burning to ensure sterilization.

- *Utility Line Collision Potential and Electrocution Mitigation*. Most municipal and cooperative utilities in the KNRC counties have avian protection programs to reduce collision and electrocution hazards to the LPC and other avian species. As part of new construction or major maintenance, these programs contemplate installation of longer cross-arms (increases conductor spacing) and covered jumpers and bushing covers (insulates pole and substation equipment). A study was undertaken, one objective of which was to examine the effectiveness of utility collision and electrocution mitigation programs -- and if beneficial to the LPC, to encourage modifications during line reconstruction or reconductor changes.[9]

In submissions and in-person discussions with FWS, KNRC identified, described, and documented the far-reaching, adverse and long-term economic and land use impacts western Kansas counties would suffer if the LPC were improperly listed -- especially in the absence of a factual record that warranted such a decision.

Indeed, during the listing process, data, information, and anecdotal evidence collected by KNRC documented a discernible chilling effect that the listing *proposal* already had had on

---

[9] *Lesser Prairie Chicken Conservation, Management and Study Plan* of The Kansas Natural Resource Coalition, *supra*, Exhibit B at B-1, B-3, and B-4.

corporate decision-making, financial investment, and energy-construction projects across the oil and gas, electric-utility and wind-energy sectors in western Kansas..

The economy of most counties in rural Kansas is substantially dependent upon ranching, farming, beef processing, energy extraction/transport, and electric generation. The KNRC counties rely upon these forms of commerce as a source of tax revenue, family-wage jobs, and ultimately as engines for economic and social stability. KNRC demonstrated how a listing decision that ignored the extensive local conservation efforts throughout the LPC's range in western Kansas would adversely affect commercial activity, and thereby cause irreversible, long-term harm to the industrial capacity, agricultural systems, and socioeconomic vitality of these communities. Those adverse consequences include:

- The permanent conservation easements for habitat protection required by the listing will have multiple, adverse consequences on privately-owned property, the community tax base, and the long-term economic stability of the region. Impacts from these easements will include a substantial decrease in land valuations; negative impacts from land management restrictions; an unwillingness of local banks to make loans on lands near or on easement properties; and diminution of land productivity resulting from restricted access to natural resources.

- Restrictions on energy production by the removal of lands from oil and gas production for conservation activities will adversely affect the local economies of KNRC counties and reduce the number of family-wage jobs available to residents.

- Local economic activity will be diminished by adverse impacts of the listing on "split estate" lands, as conservation easements on surface land could deprive access to subsurface mineral-rights holders for exploration and development.

- Construction costs of electric utility transmission and distribution lines will increase substantially, inhibiting future development and impacting existing customers in these sparsely-populated, rural counties. The resulting rate increases will be spread across, and have a disproportionate effect upon, those in lower income brackets who tend to be elderly, minorities, and the indigent dependent upon social programs.

- Locational restrictions will be levied upon infrastructure and utility construction projects, including roads, electric distribution lines and transmission facilities, as well as oil and gas production, collection and storage facilities.

- Minority populations including Hispanics, Somalis, and other underprivileged groups comprise the majority of the workforce at farms, regional feedlots, and beef packing plants in western Kansas. These groups will be disproportionately affected by the permanent transition of productive agricultural lands to habitat resulting from the listing. These changes will inevitably cause a loss of family-jobs and an erosion of the socioeconomic circumstances in affected communities.

- Counties in western Kansas derive most of their revenues from taxes on land usage. Lands set aside for open space generate far less revenue than those in agricultural and energy production. Local tax bases will shrink from usage restrictions imposed as a result of the listing, and tax rates for all residents will rise as local governments are forced to fund services from a diminished economic base.

In documents and discussions with FWS, KNRC submitted that the extensive State and local conservation plans, designed and implemented at a grassroots level by people with the greatest knowledge of conditions in the affected communities and with personal familiarity with the habits of the LPC, would produce far more effective protection and a more finely tailored balance between the natural and human environments than the adverse effects from an imposed, one-size-fits-all, top-down federal plan. Information available to the KNRC suggests that the predicted adverse effects of a listing are now being experienced across western Kansas.[10]

The important fact, however -- and the one that collusively demonstrates that the listing decision was arbitrary, capricious, and otherwise violated APA -- is that FWS did not give sufficient consideration to, but essentially ignored, the voluminous data and analyses submitted by many State and local governments, including the KNRC, that the listing was not justified because of the extensive degree of protection of the species and its habitat afforded by conservation programs in place at the grassroots level.

---

[10] Reports received by the KNRC show reductions in land values are already being experienced in or near LPC conservation and mitigation areas; oil and gas drilling activity has diminished, with a corresponding loss of 15 jobs per rig; wind farm projects have been cancelled; and bank loan activity has diminished due to lender concerns about the effect of the listing on land values.

## CONCLUSION

The Court should grant Plaintiffs' Motion for Summary Judgment, on the ground that the FWS acted arbitrarily, capriciously, and contrary to law in listing the LPC as endangered.

Respectfully submitted,

| | |
|---|---|
| JOHN F. COONEY | RICK G. STRANGE |
| Venable LLP | Cotton, Bledsoe, Tighe & Dawson PC |
| 575 7th Street, N.W. | 500 West Illinois, Suite 300 |
| Washington, D.C. 20004 | Midland, Texas 79701 |
| (202) 344–4812 | (432) 897-1440 |
| jfcooney@venable.com | rstrange@cbtd.com |
| | |
| | *Counsel for Amicus Curiae* |
| May 7, 2015 | *Kansas Natural Resource Coalition* |